PAN HANDLE REALTY, LLC *v.* ROBERT OLINS
(AC 33592)

Lavine, Sheldon and Peters, Js.

---

Argued October 31, 2012—officially released February 5, 2013

*Kenneth M. Rozich,* with whom, on the brief, was *Paulo M. Louro,* for the appellant (defendant).

*Alan R. Spirer,* for the appellee (plaintiff).

*Opinion*

SHELDON, J. In this breach of contract action, the defendant, Robert Olins, appeals from the judgment of the trial court in favor of the plaintiff, Pan Handle Realty, LLC, rendered after a trial to the court. On appeal, the defendant claims that the court: (1) abused its discretion by deciding this case on the merits prior to hearing the parties' closing arguments, which it had previously scheduled pursuant to Practice Book § 15-5 (a) (5); (2) improperly found that the parties entered into a binding lease agreement, which the defendant subsequently breached; and (3) improperly determined that the defendant failed to prove his special defense that the plaintiff had failed to mitigate its damages resulting from his alleged breach. We disagree and, thus, affirm the judgment of the trial court.

The following facts and procedural history are relevant to the resolution of this appeal. The plaintiff is a Connecticut limited liability company owned by Irwin Stillman and Robert Stillman, which constructed a luxury home at 4 Pan Handle Lane in Westport (the property). The plaintiff initially attempted to sell the property for a price of $5,950,000, which it later reduced when that effort proved unsuccessful. Thereafter, the defendant expressed an interest in leasing the property from the plaintiff for a period of one year. In pursuit of that interest, he submitted an application proposing

to rent the property from the plaintiff at the rate of $12,000 per month, together with an accompanying financial statement. The plaintiff responded to the defendant's proposal by preparing a draft lease for his review, which the defendant promptly forwarded to his attorney.

On January 17, 2009, the defendant and his real estate agent, Laura Sydney, met with Irwin Stillman, then acting as the plaintiff's representative, to discuss the draft lease (January 17 meeting). At that meeting, the defendant and Irwin Stillman agreed to several revisions to the draft lease that had been proposed by the defendant's attorney, then incorporated the revisions into the lease and signed it. The resulting lease, which was dated January 19, 2009, specified a lump sum annual rent of $138,000. At the time of the signing, the defendant gave the plaintiff a postdated check for $138,000, drawn on the account of Argyle Capital Management (Argyle), a company of which the defendant was the sole shareholder.[1] The lease agreement required the plaintiff to make certain modifications to the property prior to the occupancy date, including the removal of all of the furnishings from the leased premises.[2] In turn, it required the defendant to tender a security deposit to the plaintiff, to provide the plaintiff with proof of insurance for the property, and to execute a guaranty on behalf of Argyle because his postdated rental check had been drawn on Argyle's account.

On January 21, 2009, the plaintiff's real estate broker informed it that, according to Sydney, the defendant

---

[1] At trial, the defendant testified that Argyle had been inactive for several years.

[2] The property had been furnished, or "staged," by the plaintiff's realtor in an attempt to make it more attractive to prospective purchasers. The defendant also requested that the plaintiff add shelves to the closet and bathroom in the master bedroom and that the plaintiff fasten the moving seats in the media room to the floor.

planned to move into the property on January 28, 2009. The next day, the defendant requested information from the plaintiff for his renter's insurance policy, which the plaintiff duly provided. By that time, the plaintiff had also completed the modifications requested by the defendant at the January 17 meeting and agreed to in the lease agreement, including the removal of the furniture. The defendant's check, which was postdated January 26, 2009, was deposited by the plaintiff on that date.

The following day, however, Citibank advised the plaintiff that the defendant had issued a stop payment order on his postdated rental check and explained that the check would not be honored. The plaintiff subsequently received a letter from the defendant's attorney stating that "[the defendant] is unable to pursue any further interest in the property." Thereafter, the plaintiff made substantial efforts to secure a new tenant for the property, listing the property with a real estate broker, advertising its availability and expending $80,000 to restage it. Although, by these efforts, the plaintiff generated several offers to lease the property, it was never able to find a qualified tenant, or, for that reason, to enter into an acceptable lease agreement with anyone for all or any part of the one year period of the defendant's January 19, 2009 lease.

Thereafter, on March 6, 2009, the plaintiff filed this action, alleging that the defendant had breached an enforceable lease agreement. The plaintiff further alleged that, despite its efforts to mitigate its damages, it had sustained damages as a result of the defendant's breach, including unpaid rental payments it was to have received under the lease, brokerage commissions it incurred to rent the property again and the cost of modifications to the property that were completed at the defendant's request.

At the close of evidence at trial on March 10, 2011, the court ordered the parties to submit their final briefs in the case by April 25, 2011, to submit reply briefs by May 9, 2011, and to appear in court to deliver their closing arguments on May 16, 2011. On May 11, 2011, however, just after the parties filed their reply briefs but before the scheduled date for closing arguments, the court issued a memorandum of decision resolving the merits of the case in favor of the plaintiff (May 11 decision). In that decision, the court found, more particularly, that the plaintiff had met its burden of proving that the parties had entered into an enforceable lease agreement, that the defendant had breached that agreement, and that the breach had caused the plaintiff damages in lost rent and utility bills incurred during the lease period, but that the defendant had failed to meet his burden of proving his special defense that the plaintiff had failed to mitigate its damages after the breach. On the basis of these findings, the court awarded the plaintiff compensatory damages in the amount of $146,000—$138,000 in unpaid rent for the term of the lease and $8000 in utility fees incurred by the plaintiff during the lease period—plus interest, and attorney's fees in amounts to be determined at a later evidentiary hearing.[3]

On May 31, 2011, the defendant filed a motion to reargue and for articulation. The court denied the motion to reargue without opinion on June 3, 2011. Thereafter, on June 13, 2011, at the hearing previously scheduled to resolve the issues of attorney's fees and interest, the court granted the defendant's renewed motion for reargument. Counsel for the defendant made that motion in light of the premature issuance of the

---

[3] In its May 11 decision, the court announced that a hearing would be held on June 13, 2011, to resolve the issues of attorney's fees and interest. The court stated that "[t]he effect of this decision is not operative until the [c]ourt makes its rulings after that hearing."

court's decision on the merits without hearing the parties' closing arguments. Thereafter, the court heard oral argument on the merits of the case. The following day, on June 14, 2011, the court issued a second memorandum of decision (June 14 decision), in which it reissued, in its entirety, its earlier May 11 decision on the merits and awarded the plaintiff additional sums for interest and attorney's fees.[4] This appeal followed.

I

On appeal, the defendant first claims error in the court's issuance of its May 11 decision on the merits of this case before hearing the parties' previously scheduled closing arguments. The defendant claims, by doing so, the court not only violated our established rules of practice for the trials of civil cases, which assertedly entitled him to present a closing argument before the court issued its decision, but did so in a manner that caused him harm, thereby entitling him to the reversal of the judgment against him and a new trial. We disagree.

In support of his claim, the defendant relies principally on Practice Book § 15-5 (a), which provides in relevant part: "[u]nless the judicial authority for cause permits otherwise, the parties shall proceed with the trial and argument in the following order: (1) The plaintiff shall present a case in chief. (2) The defendant may present a case in chief. (3) The plaintiff and the defendant may present rebuttal evidence in successive rebuttals, as required. . . . (4) The plaintiff shall be entitled to make the opening and final closing arguments. (5) The defendant may make a single closing

---

[4] The reissued memorandum of decision added $34,031 in interest and $16,431.35 in attorney's fees to the defendant's previously calculated total damages of $146,000 in unpaid rent and utility fees, for a total award of $196,462.35.

argument following the opening argument of the plaintiff." Under this rule, the defendant claims that he had an absolute right to present a closing argument on his behalf before the court decided the case on the merits at trial.

As written, however, Practice Book § 15-5 (a) not only establishes the ordinary procedure for the trial of civil cases, including the right of a civil defendant to present a single oral argument between the opening and final closing arguments of his or her opponent; it also confirms the power of the trial court to depart from that procedure "for cause." See *de Repentigny* v. *de Repentigny*, 121 Conn. App. 451, 455–56, 995 A.2d 117 (2010).

"The interpretation of rules of practice and statutes is a question of law subject to plenary review. . . . Subdivisions (1) through (5) of Practice Book § 15-5 (a) prescribe a certain procedure to be followed in civil trials and family matters. The clear import of the introductory language is that the court may depart from this prescribed trial procedure 'for cause . . . .' Practice Book § 15-5 (a)." (Citation omitted.) *de Repentigny* v. *de Repentigny*, supra, 121 Conn. App. 456. For that reason, the rule has been held by this court to permit the trial court, "for cause, [to] elect to accept legal briefs in lieu of oral closing arguments." Id.

"[W]hen considering whether there was cause for a court to [deviate from the procedures] prescribed in Practice Book § 15-5 (a), we review the decision of the court under the abuse of discretion standard." Id. The defendant "bears a heavy burden in demonstrating that the court abused its broad discretion in its ordering of [such deviations]. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not

reasonably conclude as it did." (Internal quotation marks omitted.) Id. Even if we were to conclude, however, that the court abused its discretion by deviating from the procedures prescribed in § 15-5 (a), we cannot reverse its resulting judgment unless we further conclude that the error was prejudicial. "The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . Generally, a trial court's ruling will result in a new trial only if the ruling was both wrong and harmful. . . . [B]efore a party is entitled to a new trial because of an erroneous . . . ruling, he or she has the burden of demonstrating that the error was harmful." (Citations omitted; internal quotation marks omitted.) *Doyle* v. *Kamm*, 133 Conn. App. 25, 34–35, 35 A.3d 308 (2012).

In this case, neither the court nor counsel for either party has advanced any reason to justify the court's issuance of its decision on the merits without first hearing the parties' previously scheduled closing arguments. Instead, the court's action appears to have been an innocent mistake, resulting from its failure to recall that it had set a date for closing arguments in addition to deadlines for the submission of final posttrial briefs and reply briefs. In these circumstances, the court's unintentional deviation from the ordinary order of proceedings in civil trials was not "for cause," as might otherwise have been permitted by Practice Book § 15-5 (a) and, thus, surely constituted an abuse of its discretion because it could not reasonably have acted as it did.

Our conclusion, however, that the court abused its discretion does not end our inquiry. Instead, to reiterate, "[g]enerally, a trial court's ruling will result in a new trial only if the ruling was both wrong *and* harmful." (Emphasis in original; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 127 Conn. App. 454, 460, 14 A.3d 1053, cert. denied, 302 Conn. 933, 28 A.3d 991 (2011). It is, thus, incumbent on

the defendant to demonstrate on appeal that the court's deviation from the prescribed schedule was not only wrong but also prejudicial. See *Wiseman* v. *Armstrong*, 295 Conn. 94, 108, 989 A.2d 1027 (2010) ("[b]efore a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful" [internal quotation marks omitted]). That, in turn, depends upon the effect of the error on the defendant's right to present and to receive a fair hearing on his defense and to receive a fair decision on the claims against him from an impartial and open-minded judicial fact finder, notwithstanding the premature issuance of the court's decision.

For the following reasons, we conclude that, although the court's innocent but unfortunate mistake was improper, any prejudice potentially arising from it was fully cured by the court's own subsequent actions. Because the defendant has failed to demonstrate how the court's error affected the result of the case, its occurrence does not entitle him to a new trial.

Upon learning of its error in deciding this case on the merits before hearing the previously scheduled arguments of counsel, the court attempted to cure the error, at the urging of the defendant's counsel, by hearing belated final arguments from the parties on the merits of their claims and defenses. Although these matters had already been addressed and decided by the court in its May 11 decision, neither party took the position that the court had lost its objectivity on the issues presented or lacked the capacity to examine those issues anew, with an open mind and without bias, in light of their oral arguments. Accordingly, neither counsel objected to the procedure, moved for a mistrial or otherwise challenged the fairness and legitimacy of the process before the arguments were presented, when the proposed cure was first suggested, or afterwards, once they had observed the manner in which the court

received and responded to their oral advocacy. Indeed, the defendant's counsel had proposed the procedure and, thus, in the absence of further objection or proposals for cure, communicated his satisfaction with its effectiveness to cure any prejudice that might otherwise have been caused by the court's error.

Against this background, the court's June 14 decision was unquestionably issued on the basis of the parties' oral arguments as well as their briefs, all with the consent of counsel. Accordingly, we conclude, as did counsel, that the court's error, however unfortunate, was harmless because it did not deprive the defendant of his right to oral argument or his right to a fair decision by an unbiased decision maker. In light of the curative measures adopted by the court, to which all parties acquiesced, it is clear beyond question that the final result of this case was not affected by the court's error, and, thus, its occurrence does not entitle the defendant to a new trial.

## II

The defendant's second claim on appeal is that the court improperly determined that the parties entered into a valid lease agreement. The defendant contends that because "material terms were still being negotiated and various issues [were] unresolved," there was no meeting of the minds, which is required to form a contract. We are not persuaded.

"A lease is a contract. . . . The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. . . . On appeal, our review is limited to a determination of whether the trier's findings are clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the

memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . .

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling. . . .

"In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make. . . . [A]n agreement must be definite and certain as to its terms and requirements. . . . [N]umerous Connecticut cases require definite agreement on the essential terms of an enforceable agreement. . . . [Furthermore] [w]hether a term is essential turns on the particular circumstances of each case." (Citations omitted; internal quotation marks omitted.) *Hawley Avenue Associates, LLC* v. *Robert D. Russo, M.D. & Associates Radiology, P.C.*, 130 Conn. App. 823, 828–29, 25 A.3d 707 (2011).

There was evidence in the record to support the court's finding that the parties entered into a valid lease agreement because there was a true meeting of the parties' minds as to the essential terms of the agreement. Prior to the January 17 meeting, the plaintiff

had provided the defendant with a draft lease agreement, which the defendant had forwarded to his attorney for review. The defendant testified that at the January 17 meeting, he and the plaintiff's representative discussed the revisions proposed by the defendant's attorney, made the revisions and signed the lease.[5] It was then that the defendant tendered a check, post-dated to the start of the lease period, on which he noted payment for a one year lease of the premises.

There is no evidence in the record to support the defendant's contention that he did not intend to be bound by the lease when he signed it or that terms of the lease were still being negotiated at that time. Pursuant to the lease, the plaintiff was obligated to make modifications to the premises and the defendant was required to tender a security deposit, procure renter's insurance and execute a guaranty on behalf of Argyle. The fact that the lease obliged the parties to make certain preparations before the lease period commenced does not militate against its being a valid and binding contract. See *Scoville* v. *Shop-Rite Supermarkets, Inc.*, 86 Conn. App. 426, 431, 863 A.2d 211 (2004) ("[i]t is [well] established . . . that parties are free to contract for whatever terms on which they may agree" [internal quotation marks omitted]), cert. denied, 272 Conn. 921, 867 A.2d 838 (2005). The defendant's apparent unilateral change of heart regarding the lease agreement does not negate the parties' prior meeting of the minds that occurred at the time the lease was executed. There is ample evidence in the record evincing the intent of the parties to be bound by the lease when they signed it and, thus, to support the court's

[5] The defendant also testified that all of the revisions at issue during the January 17 meeting benefited him and not the plaintiff. For instance, the defendant requested that the plaintiff refrain from posting any signs on the property during the lease period. The plaintiff agreed to each of these changes, which were written on the lease before the parties signed it.

finding that "the lease agreement was a valid and binding contract which the defendant . . . has breached."

## III

The defendant's final claim on appeal is that the court improperly found that he failed to sustain his burden of proof regarding his claim that the plaintiff had failed to make reasonable efforts to mitigate its damages. The defendant asserts that the record supports a finding that the plaintiff could have done more to mitigate its damages. We are not persuaded.

"A lease is nothing more than a contract. . . . Thus, as in any other contract action the measure of damages is that the award should place the injured party in the same position as he would have been in had the contract been fully performed. . . . As a consequence, the unpaid rent, while not recoverable as such, may be used by the court in computing the losses suffered by the plaintiff by reason of the defendant's breach of contract of lease. The plaintiff would be entitled to recover the damages which would naturally follow from such a breach." (Internal quotation marks omitted.) *Heritage Square, LLC* v. *Eoanou*, 61 Conn. App. 329, 335, 764 A.2d 199 (2001).

"We have often said in the contracts and torts contexts that the party receiving a damage award has a duty to make reasonable efforts to mitigate damages. . . . What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier. . . . Furthermore, we have concluded that the breaching party bears the burden of proving that the nonbreaching party has failed to mitigate damages. . . .

"[W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are

clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Dunleavey* v. *Paris Ceramics USA, Inc.*, 97 Conn. App. 579, 582–83, 905 A.2d 703 (2006).

A review of the record reveals that prior to the execution of the subject lease, the property had been staged by the plaintiff's former real estate agent. Upon the execution of the lease, however, and in accordance with the defendant's request, the plaintiff removed the furnishings. After the defendant's breach of the lease, the furnishings were no longer available, and the plaintiff had to spend $80,000 to restage the property in order to lease it again. In order to recover the loss, it was reasonable for the plaintiff to advertise the property at a higher rent than the defendant had agreed to pay.[6] Moreover, although the plaintiff was unsuccessful in its efforts to secure a replacement lessee, there is no evidence to suggest that the plaintiff was not responsive to prospective replacement lessees.

After careful review of the record, we conclude that the evidence before the court supports its finding that the plaintiff's conduct in mitigating damages was reasonable under the circumstances. The court's finding,

[6] Robert Stillman testified at trial that the rent specified in the defendant's rental application, $12,000, was discounted in consideration for the defendant's lump sum payment of the year's lease upon the signing of the lease agreement. Moreover, before dealing with the defendant, the plaintiff had listed the property at a higher rental price than that which the parties had agreed upon.

therefore, was not clearly erroneous, and we decline to disturb the court's judgment awarding damages.

The judgment is affirmed.

In this opinion the other judges concurred.