******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBERT C. GODFREY *v.* COMMISSIONER
OF CORRECTION
(AC 42890)

Bright, C. J., and Prescott and Suarez, Js

*Syllabus*

The petitioner, who had pleaded guilty to murder, appealed to this court
from the judgment of the habeas court, which denied his petition for a
writ of habeas corpus. The petitioner alleged, inter alia, that his guilty
plea should be vacated pursuant to the doctrine of frustration of purpose
because the subsequent abolishment of the death penalty in Connecticut
frustrated his principal purpose in accepting the plea agreement, namely,
to avoid the death penalty. The relief he sought was a judgment vacating
the original plea agreement and the remand of his case for resentencing
in accordance with a plea that would have been negotiated had the
death penalty been unavailable. The habeas court, after a trial at which
both of the petitioner's trial counsel testified, concluded that the peti-
tioner failed to prove that his principal purpose for agreeing to enter a
guilty plea was substantially frustrated by the subsequent abolition of
the death penalty and that he had assumed the risk that the death penalty
subsequently might be abolished. On the granting of certification, the
petitioner appealed to this court. *Held* that the petitioner cannot prevail
on his claim that he was entitled to relief under the frustration of purpose
doctrine because, even if this court assumed that the frustration of
purpose doctrine applied to plea agreements, by accepting the plea
agreement, contract principles dictate that the petitioner assumed the
risk that at some point the death penalty could be abolished: the record
demonstrated that the terms of the agreement were unambiguous, that
the petitioner was fully aware of the consequences of his bargain, and
the parties, having been made aware of the potential for future favorable
changes to the law, intended for the plea agreement to remain enforce-
able notwithstanding any future changes to the law, including the subse-
quent abolition of the death penalty in Connecticut, which did not change
the petitioner's expectations under the agreement, namely, that he serve
a full sixty year sentence and not be permitted to appeal or withdraw his
guilty plea after the court imposed the agreed upon sentence; moreover,
although the petitioner may have miscalculated the likely penalties
attached to alternative courses of action, an individual cannot withdraw
a guilty plea merely because a subsequent change in the law rendered
the maximum penalty for the crime in question less than was reasonably
assumed at the time the plea was entered, even when the maximum
penalty at issue was death, and any such miscalculation did not provide
a basis to grant habeas relief to the petitioner regarding his guilty plea;
furthermore, as our Supreme Court unequivocally has rejected the ame-
lioration doctrine, which provides that amendments to statutes that
lessen their penalties are applied retroactively, it would be improper to
vacate the petitioner's guilty plea pursuant to the frustration of purpose
doctrine, which in this instance is the functional equivalent of applying
the amelioration doctrine and which would work a substantial injustice
on the state in new plea negotiations as the petitioner would enjoy a
much greater degree of leverage than in the first negotiation because
of the numerous difficulties attendant to securing a conviction at trial
nearly twenty years after the crime was committed, including evidence
that has become stale, memories that have faded, and witnesses that
may no longer be available.

Argued October 8, 2020—officially released February 23, 2021

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district
of Tolland and tried to the court, *Bhatt, J.*; judgment
denying the petition, from which the petitioner, on the

granting of certification, appealed to this court. *Affirmed.*

*Vishal K. Garg*, assigned counsel, for the appellant (petitioner).

*Tamara Grosso*, assistant state's attorney, with whom, on the brief, were *Laurie N. Feldman*, deputy assistant state's attorney, and *Gail P. Hardy*, former state's attorney, for the appellee (respondent).

*Opinion*

PRESCOTT, J. This appeal presents the important question of whether, under the common-law contractual "frustration of purpose" doctrine, a habeas petitioner who had been charged with a capital felony and pleaded guilty to murder in order to avoid the imposition of the death penalty is entitled to withdraw his guilty plea sixteen years later because the death penalty has since been abolished. We conclude that, even if the frustration of purpose doctrine applies to criminal plea agreements, the petitioner, Robert C. Godfrey, is not entitled to relief under that doctrine because by entering into the plea agreement, he assumed the risk that the death penalty might be abolished at some point while he was serving his sentence of sixty years of incarceration.

The petitioner appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the court improperly concluded that he was not entitled to habeas relief with respect to a collateral attack on his guilty plea because (1) he failed to prove that his principal purpose for entering into a guilty plea with an agreed upon sixty year sentence was substantially frustrated by the subsequent abolition of the death penalty and (2) he had assumed the risk that the law might change in his favor.[2] We conclude that the habeas court properly determined that the petitioner had assumed the risk that the death penalty might be abolished at some point while he was serving his sixty year sentence, and, therefore, we do not reach his first claim. Accordingly, we affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our disposition of the petitioner's claims.[3] On November 9, 2001, the East Hartford police responded to apartment 209 of an apartment complex on a report that a woman was found dead. Upon arrival, the police observed the woman's nude body, with a large open wound to the back of her head, lying face down next to the bed. There were large amounts of blood on the walls, the bed, and the floors of the apartment. In the kitchen, there were what appeared to be bloody footprints. The footprints led from apartment 209, up the outer staircase, to the door of apartment 309, which is where the petitioner lived. When the petitioner first was interviewed by the police, he indicated that he knew the victim, and that they may have had a few beers together, but he did not know how the bloody footprints could have ended up outside of his doorway. The petitioner consented to the taking of a DNA sample, which later was determined by the medical examiner to match the semen found in the victim. The cause of the victim's death was cranial cerebral trauma, caused by ten to fifteen blows from a sharp instrument. A search warrant was executed at the petitioner's apartment, where the police found bloody footprints inside, which later were

determined to match the petitioner's own footprints, and clothes stained with the victim's blood.

On November 27, 2001, the petitioner was charged with capital felony in violation of General Statutes (Rev. to 2001) § 53a-54b (7), murder in violation of General Statutes § 53a-54a, felony murder in violation of General Statutes § 53a-54c, two counts of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) (2), and two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). Thereafter, the petitioner entered into a plea agreement with the state. Pursuant to the agreement, the state filed a substitute information charging the petitioner with one count of murder in violation of § 53a-54a (a), to which he agreed to plead guilty in exchange for a sentence of sixty years of incarceration. On March 11, 2004, the court canvassed the petitioner regarding his guilty plea. Through that canvass, the court determined, inter alia, that the petitioner understood that (1) the guilty plea was "for keeps," meaning that he would not be permitted to "change his mind later and take it back," (2) he could not withdraw his guilty plea "unless the court doesn't impose a sentence agreed upon," (3) he was "giving up any rights to an appeal," and (4) the sentencing statute required that he serve the sixty years "day for day." The court found that there was a factual basis for the petitioner's guilty plea and that it was knowingly and voluntarily made. The court then accepted the plea and later sentenced the petitioner, consistent with the plea agreement, to a term of sixty years of imprisonment.

On April 25, 2012, No. 12-5 of the 2012 Public Acts (P.A. 12-5) was signed into law, prospectively repealing the death penalty for all crimes committed on or after that date, and retaining the death penalty for capital felonies committed prior to that date. Three years later, our Supreme Court, in *State* v. *Santiago*, 318 Conn. 1, 119, 122 A.3d 1 (2015), held that the imposition of the death penalty on offenders who committed capital crimes prior to the enactment of P.A. 12-5 would violate article first, §§ 8 and 9, of the Connecticut constitution, thus effectively abolishing the death penalty in Connecticut.

Following the release of the *Santiago* decision, the petitioner filed a petition for a writ of habeas corpus. On April 17, 2018, the petitioner filed an amended petition that alleged ineffective assistance of trial counsel in count one and, in count two, that his guilty plea should be vacated pursuant to the doctrine of frustration of purpose because the abolishment of the death penalty in Connecticut frustrated his principal purpose in accepting the plea agreement, namely, to avoid the death penalty. The relief sought in the petition is a judgment vacating the original plea agreement and the remand of his case for resentencing "in accordance

with the plea that would have been negotiated had the death penalty been unavailable." The respondent, the Commissioner of Correction, filed a return on May 21, 2018, in which he asserted that the petitioner failed to state a ground on which relief can be granted, and raised the defense of procedural default. Thereafter, the respondent filed a motion to dismiss count two of the petition on the same grounds alleged in the return. At the habeas trial, on September 4, 2018, the petitioner withdrew count one of the petition and three witnesses testified, including the petitioner and both of his trial counsel, as to count two.

Specifically, both trial counsel testified, inter alia, that they recommended to the petitioner that he plead guilty because there was a significant likelihood that he would receive the death penalty if the case went to trial because of the "horrific" nature of the crime and the weakness of evidence regarding any mitigating factors that might persuade the jury to decline to vote in favor of the death penalty.[4] One of the petitioner's trial counsel, Attorney Barry Butler, stated that he advised the petitioner that a sixty year sentence, which he would be required to serve in full, thereby rendering him ineligible for release until he is approximately ninety years old, was more favorable than a life sentence without the possibility of parole because of the potential for future changes to the law that would make someone with a finite sentence eligible for early release.[5] Attorney Butler also stated that he had discussed with the petitioner the possibility that one day the state might abolish the death penalty, although he did not have a specific expectation at that time that it would be abolished. The petitioner testified, inter alia, that avoiding the death penalty was "somewhat important" to him, that he was scared of the death penalty, and that he would not have pleaded guilty and agreed to a sixty year sentence if the death penalty had been unavailable. In addition, he stated that he did not want to plead guilty to a sexual assault, which was consistent with Attorney Butler's testimony that pleading guilty to sexual assault was a "deal breaker" for the petitioner. The habeas court rendered judgment on March 8, 2019, denying the amended habeas petition.[6] Specifically, the court concluded that, as a matter of first impression, the frustration of purpose doctrine, which is typically applied in civil cases alleging breach of contract, also applies to criminal plea agreements. The court then applied that doctrine and found that the petitioner failed to prove that (1) his principal purpose for agreeing to enter a guilty plea was substantially frustrated by the subsequent abolition of the death penalty,[7] and (2) he did not assume the risk that the death penalty subsequently might be abolished.[8] On March 18, 2019, the habeas court granted the petitioner certification to appeal the habeas court's judgment. This appeal followed. Additional facts will be set forth as needed.

On appeal, the petitioner claims that the habeas court properly determined that the frustration of purpose doctrine applies to plea agreements, but improperly concluded that he was not entitled to habeas relief because (1) he failed to prove that his principal purpose for entering into a guilty plea was substantially frustrated by the subsequent abolition of the death penalty and (2) he had assumed the risk that the law might change in his favor. In response, the respondent argues that this court need not decide whether the frustration of purpose doctrine applies to plea agreements in general or in all circumstances because, even assuming arguendo that it does apply, the petitioner has failed to satisfy all four factors required for its applicability. We agree with the respondent.

We begin by setting forth certain governing principles of law as well as our standard of review. "It is well settled that [p]rinciples of contract law and special due process concerns for fairness govern our interpretation of plea agreements. . . . As has previously been explained in the context of plea agreements, [t]he primary goal of contract interpretation is to effectuate the intent of the parties . . . . In ascertaining that intent, we employ an objective standard and look to what the parties reasonably understood to be the terms of the plea agreement on the basis of their words and conduct, and in light of the circumstances surrounding the making of the agreement and the purposes they sought to accomplish. . . . [T]he threshold determination as to whether a plea agreement is ambiguous as to the parties' intent is a question of law subject to plenary review." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Kallberg*, 326 Conn. 1, 14–16, 160 A.3d 1034 (2017).

"The doctrine of frustration of purpose . . . excuses a promisor in certain situations where the objectives of the contract have been utterly defeated by circumstances arising after the formation of the agreement. . . . Excuse is allowed under this rule even though there is no impediment to actual performance. . . . A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that: (1) the event substantially frustrated his principal purpose; (2) the nonoccurrence of the supervening event was a basic assumption on which the contract was made; (3) the frustration resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes." (Citation omitted; internal quotation marks omitted.) *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 315 Conn. 596, 605, 109 A.3d 473 (2015). Moreover, "[t]he establishment of the defense requires convincing proof of a changed situation so severe that it is not fairly regarded as being within the risks assumed under the contract." (Footnote

omitted.) 17A Am. Jur. 2d, Contracts § 640 (2020). "The doctrine of frustration of purpose is given a narrow construction so as to preserve the certainty of contracts . . . ." (Footnote omitted.) Id., § 641.[9]

"The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . [T]his court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . ." (Citation omitted; internal quotation marks omitted.) *Brooks* v. *Commissioner of Correction*, 105 Conn. App. 149, 153, 937 A.2d 699, cert. denied, 286 Conn. 904, 943 A.2d 1101 (2008). "The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012). "The excuse of frustration [of purpose] is a question of law, to be determined by the court from the facts of the case." 17A Am. Jur. 2d, supra, § 640. Accordingly, we apply a plenary standard of review to the present case, and will not disturb the underlying facts found by the habeas court unless they are clearly erroneous.

I

As the respondent correctly recognizes, we do not need to determine definitively whether the frustration of purpose doctrine applies to plea agreements in Connecticut because, even if we assume, consistent with the conclusion of numerous state and federal courts, that it does, the petitioner would not be entitled to relief under the doctrine because, by accepting the plea agreement, contract principles dictate that he assumed the risk that at some point the death penalty could be abolished. See *United States* v. *Morgan*, 406 F.3d 135, 137 (2d Cir. 2005) ("the possibility of a favorable change in the law after a plea is simply one of the risks that accompanies pleas and plea agreements"), cert. denied, 546 U.S. 980, 126 S. Ct. 549, 163 L. Ed. 2d 465 (2005); see also *United States* v. *Bradley*, 400 F.3d 459, 464 (6th Cir. 2005) ("Plea bargains always entail risks for the parties . . . [including] risks relating to future developments in the law. The salient point is that a plea agreement allocates risk between the two parties as they see fit. If courts disturb the parties' allocation of risk in an agreement, they threaten to damage the parties' ability to ascertain their legal rights when they sit down at the bargaining table and, more problematically for criminal defendants, they threaten to reduce the likelihood that prosecutors will bargain away counts . . . with the knowledge that the agreement will be immune from challenge on appeal."), cert. denied, 546 U.S. 862, 126 S. Ct. 145, 163 L. Ed. 2d 144 (2005).

Here, the record is clear that the terms of the agreement were unambiguous and that the petitioner was

fully aware of the consequences of his bargain. In other words, he knew precisely what he was gaining and what he was giving up when he opted for the certainty of pleading guilty to a single count of murder in exchange for a sixty year sentence, as opposed to standing trial for capital felony, murder, felony murder, burglary in the first degree, and sexual assault in the first degree and facing a potential sentence of (1) death, (2) life in prison without the possibility of parole, or (3) a sentence of 100 years or more of incarceration. See *United States* v. *Roque*, 421 F.3d 118, 123 (2d Cir. 2005) ("Viewing this plea agreement as a contract, we agree that certain conditions have changed since the bargain was struck. We further acknowledge that, had the parties known what they know now . . . they might have bargained differently and might even have reached a different bargain. This is simply not relevant to whether [the defendant's] plea is enforceable, however. [The defendant] understood fully the consequences of his bargain, both in terms of what he was gaining and what he was giving up. . . . [I]n opting for certainty, both parties accepted the risk that conditions relevant to their then-contemporary bargain, including [the law], might change." (Citations omitted; internal quotation marks omitted.)), cert. denied sub nom. *Delahoz* v. *United States*, 546 U.S. 1120, 126 S. Ct. 1094, 163 L. Ed. 2d 908 (2006).

Specifically, Attorney Butler advised the petitioner that a sixty year sentence, which he would be required to serve in full, is preferable to a life sentence without the possibility of parole because of the potential for future changes to the law that would make someone with a finite sentence eligible for early release. Attorney Butler likewise discussed with the petitioner the possibility that one day the state might abolish the death penalty. In addition, both of the petitioner's trial counsel recommended to him that he take the plea deal in view of what they perceived to be a significant likelihood that he would be convicted at trial and sentenced to death. With this knowledge, the petitioner elected to limit his criminal exposure, forgo a lengthy capital trial and its attendant stress for himself and his family,[10] and accept a sixty year sentence, which left open the potential for him to be released at age ninety or earlier if he became eligible for parole because of a favorable change in our parole eligibility laws. Moreover, as the trial court's thorough canvass illustrates, the petitioner understood that under the terms of the agreement (1) his guilty plea was "for keeps" in that he would not be permitted to "change his mind later and take it back," (2) he was waiving "any rights to an appeal," (3) he could not withdraw his guilty plea unless the court did not impose the agreed upon sentence, and (4) he would serve a sixty year sentence "day for day." See *United States* v. *Roque*, supra, 421 F.3d 123 ("In no circumstances . . . may a defendant, who has secured the

benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless." (Internal quotation marks omitted.)), quoting *United States* v. *Salcido-Contreras*, 990 F.2d 51, 53 (2d Cir.), cert. denied, 509 U.S. 931, 113 S. Ct. 3060, 125 L. Ed. 2d 742 (1993). That the petitioner agreed to these unambiguous terms, after having been made aware of the potential for future favorable changes to the law, indicates that the parties intended for the plea agreement to remain enforceable notwithstanding any future changes to the law.[11] See *State* v. *Kallberg*, supra, 326 Conn. 15 ("An unambiguous agreement is presumptively an accurate reflection of the parties' intent. Thus, [when] the language is unambiguous, we must give the contract effect according to its terms." (Internal quotation marks omitted.)). In addition, because the petitioner's counsel specifically discussed with the petitioner the possibility that one day the state might abolish the death penalty, the fact that this ultimately happened cannot be considered "a change so severe that it is unfair to regard it as being within the risks assumed under the contract."[12] See 17A Am. Jur. 2d, supra, § 640.

Furthermore, the subsequent abolition of the death penalty in Connecticut did not change the petitioner's expectations under the agreement, namely, that he serve a full sixty year sentence and not be permitted to appeal or withdraw his guilty plea after the court imposed the agreed upon sentence. See *United States* v. *Archie*, 771 F.3d 217, 222 (4th Cir. 2014) ("[A]lthough the law changed after [the defendant] [pleaded] guilty, his expectations (as reflected in the plea agreement) did not. . . . A plea agreement, like any contract, allocates risk. . . . And the possibility of a favorable change in the law occurring after a plea is one of the normal risks that accompan[ies] a guilty plea." (Citations omitted; internal quotation marks omitted.)), cert. denied, 575 U.S. 925, 135 S. Ct. 1579, 191 L. Ed. 2d 660 (2015). The petitioner struck a deal, the terms of which were unambiguous, and he is now seeking to retain the benefits of the bargain while reneging on his commitments to not withdraw his guilty plea and serve a sixty year sentence. See *United States* v. *Bradley*, supra, 400 F.3d 465 ("[h]aving voluntarily and knowingly bargained for a decrease in the number of counts charged against him and for a decreased sentence, [the defendant] cannot now extract two components of that bargain . . . on the basis of changes in the law after that bargain was struck"). As succinctly stated by the United States Court of Appeals for the Second Circuit, "contract principles [simply] do not support [the petitioner's] attempt to have his cake and eat it, too." (Internal quotation marks omitted.) *United States* v. *Roque*, supra, 421 F.3d 124.

## II

We next turn to a discussion of factually related precedent from other jurisdictions that informs our application of the frustration of purpose doctrine to the petitioner's plea agreement. We begin by addressing two lines of cases in which courts have excused a party's performance under a plea agreement pursuant to the frustration of purpose doctrine. In the first line of cases, the frustrating event at issue was a change in the law subsequent to a criminal defendant's guilty plea. These cases are fundamentally distinguishable, however, because the change in the law affected the criminality of the conduct for which the defendant pleaded guilty. For instance, in *United States* v. *Bunner*, 134 F.3d 1000 (10th Cir.), cert. denied, 525 U.S. 830, 119 S. Ct. 81, 142 L. Ed. 2d 64 (1998), after the defendant had served three years of a five year sentence, the United States Supreme Court issued a decision; *Bailey* v. *United States*, 516 U.S. 137, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995); under which the facts supporting the defendant's plea no longer constituted a crime. The defendant successfully moved to vacate his sentence pursuant to 28 U.S.C. § 2255.[13] See *United States* v. *Bunner*, supra, 1002. The government then moved to reinstate the counts of the original indictment that it had dismissed in exchange for the defendant's guilty plea. The United States Court of Appeals for the Tenth Circuit ruled that it was proper for the District Court to allow the government to reinstate the counts previously dismissed because the vacatur frustrated the government's principal purpose for entering the plea agreement. Id., 1003; see also *United States* v. *Moulder*, 141 F.3d 568, 572 (5th Cir. 1998) ("[T]he parties' assumptions and obligations were altered by *Bailey* and the subsequent successful [28 U.S.C.] § 2255 challenges. As a result of those events the underlying purpose of the [plea] agreement [was] frustrated and the basis of the government's bargain [was] destroyed. Thus, under the frustration of purpose doctrine, the government's plea agreement obligations became dischargeable." (Internal quotation marks omitted.)); *United States* v. *Samuels*, 454 F. Supp. 3d 595, 602–603 (E.D. Va. 2020) ("[U]nder the frustration of purpose doctrine, the [g]overnment's obligations under the plea agreement would become dischargeable should [the d]efendant successfully vacate his . . . convictions by way of his [28 U.S.C.] § 2255 [m]otion. . . . Then . . . the [g]overnment could move to reinstate the [i]ndictment . . . ." (Citations omitted.)), cert. pending, United States Court of Appeals, Docket No. 20-6894 (4th Cir. June 17, 2020). The subsequent change in the law that forms the basis for the petitioner's claim in the present case did not render legal the conduct for which the petitioner pleaded guilty.

In a second line of cases in which the frustration of purpose doctrine has been applied to plea agreements,

courts have held that the principal purpose of the agreement was substantially frustrated when the specific terms of the agreement were not actually imposed. See *United States* v. *Thompson*, 237 F.3d 1258, 1260–61 (10th Cir.) (federal government charged defendant with crime and defendant entered into plea agreement with government to plead guilty in Oklahoma state court and be sentenced to ten years of imprisonment, but when state failed to charge defendant within applicable statute of limitations, government no longer bound by plea agreement), cert. denied, 532 U.S. 987, 121 S. Ct. 1637, 149 L. Ed. 2d 497 (2001); *United States* v. *Jureidini*, 846 F.2d 964, 965 (4th Cir. 1988) (parties agreed that for purposes of parole consideration defendant would be classified as having committed category six offense but parole board placed him in category eight); see also *United States* v. *Torres*, 926 F.2d 321, 322, 325–26 (3d Cir. 1991) (parties agreed that defendant's sentencing range was to be based on lesser quantity of drugs than that which court ultimately relied when sentencing defendant); *United States* v. *Kemper*, 908 F.2d 33, 37 (6th Cir. 1990) (same). These cases are readily distinguishable because, here, the court imposed the agreed upon sentence, and there is no claim that the agreement has been breached.

The cases that are most instructive to our analysis of the assumption of risk prong of the frustration of purpose doctrine involve defendants charged with a capital felony, who pleaded guilty to avoid capital punishment, and, after a subsequent change in the law that would have rendered them ineligible for the death penalty if the new law was in place at the time they were charged, sought to withdraw the guilty plea.[14]

For example, in *Dingle* v. *Stevenson*, 840 F.3d 171, 172–73 (4th Cir. 2016), cert. denied, U.S. , 137 S. Ct. 2094, 197 L. Ed. 2d 897 (2017), the defendant, who was seventeen years old when he pleaded guilty to several charges to avoid the death penalty, sought to invalidate his plea after the United States Supreme Court held, in *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), that imposing capital punishment on juvenile offenders was a violation of the eighth amendment to the United States constitution. The United States Court of Appeals for the Fourth Circuit rejected the defendant's claim, holding that *Roper* could not be applied retroactively to invalidate the defendant's guilty plea. *Dingle* v. *Stevenson*, supra, 175.

In reaching this conclusion, the court reasoned: "Contracts in general are a bet on the future. Plea bargains are no different: a classic guilty plea permits a defendant to gain a present benefit in return for the risk that he may have to [forgo] future favorable legal developments. [The defendant] received that present benefit— avoiding the death penalty and life without parole— under the law as it existed at the time. Although *Roper*,

in hindsight, altered the calculus underlying [the defendant's] decision to accept a plea agreement, it does not undermine the voluntariness of his plea. . . . [T]he tradeoff between present certainty and future uncertainty is emblematic of the process of plea bargaining. *Brady* [v. *United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970)] makes all that exceptionally clear . . . ." *Dingle* v. *Stevenson*, supra, 840 F.3d 175–76; see also *Brant* v. *State*, 830 S.E.2d 140, 142 (Ga. 2019) (rejecting claim by defendant, who was seventeen years old when he entered plea agreement to avoid possibility of receiving death penalty, that his plea was rendered involuntary by *Roper*).

Indeed, in *Brady*, the Supreme Court ruled that the petitioner, who was charged with kidnapping pursuant to 18 U.S.C. § 1201 (a), and had pleaded guilty to avoid the death penalty, was not entitled to withdraw his guilty plea in light of the court's subsequent holding in *United States* v. *Jackson*, 390 U.S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968), that 18 U.S.C. § 1201 (a) was unconstitutional. *Brady* v. *United States*, supra, 397 U.S. 743–45. The court reasoned, inter alia: "Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. . . .

"A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the [s]tate's case or the likely penalties attached to alternative courses of actions. More particularly, absent misrepresentation or other impermissible conduct by state agents . . . a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." (Citation omitted.) Id., 756–57. In other words, "[a] plea of guilty triggered by the expectations of a competently counseled defendant that the [s]tate will have a strong case against him is not subject to later attack because the defendant's lawyer correctly advised him with respect to the then existing law as to possible penalties but later pronouncements of the courts, as in this case, hold that the maximum penalty for the crime in question was less than was reasonably assumed at the time the plea was entered." Id., 757.

As *Dingle*, *Brant*, and *Brady* illustrate, an individual cannot withdraw a guilty plea merely because a subsequent change in the law renders the maximum penalty for the crime in question less than was reasonably

assumed at the time the plea was entered—even when the maximum penalty at issue was death. The natural implication of these cases is that a criminal defendant who negotiates a plea agreement "in the shadow of the death penalty" assumes the risk that the law subsequently could change such that the death penalty is no longer a permissible punishment for the crime(s) for which the defendant originally was charged. *Dingle* v. *Stevenson*, supra, 840 F.3d 174.

As in *Brady*, the petitioner here may have miscalculated the likely penalties attached to alternative courses of action. Despite being aware that it was possible that the state someday might abolish the death penalty, the petitioner and his counsel possibly misjudged the likelihood of this happening at some point while he was serving his sixty year sentence. Any such miscalculation, however, does not provide a basis to grant habeas relief to the petitioner regarding his guilty plea. See *State* v. *Reid*, 277 Conn. 764, 788–89, 894 A.2d 963 (2006) ("[I]mperfect knowledge of future developments in the law has no bearing on the validity of a [guilty plea]. . . . More than [thirty] years later the Supreme Court reaffirmed *Brady* and explained that the [c]onstitution . . . permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." (Citation omitted; internal quotation marks omitted.)), citing *Brady* v. *United States*, supra, 397 U.S. 742, and *United States* v. *Ruiz*, 536 U.S. 622, 630, 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002). Accordingly, we conclude that the petitioner has failed to satisfy the assumption of risk prong of the frustration of purpose doctrine and, therefore, is not entitled to any relief.

### III

Finally, our conclusion that the petitioner's guilty plea cannot be withdrawn pursuant to the frustration of purpose doctrine is buttressed by two policy rationales: (1) fundamental fairness; and (2) our Supreme Court's refusal to adopt the amelioration doctrine. We address each of these in turn.

Our habeas corpus statute, General Statutes § 52-470 (a), requires that "the court or judge hearing any habeas corpus shall . . . dispose of the case as law and justice require." See *Summerville* v. *Warden*, 229 Conn. 397, 415, 641 A.2d 1356 (1994). Here, if we were to hold that the petitioner is entitled to vacate his plea agreement, it would work a substantial injustice on the state. That is, the case would be returned to the criminal trial court for plea negotiations, in which the petitioner would enjoy a much greater degree of leverage than in the first negotiation because of the numerous difficulties attendant to securing a conviction at trial nearly twenty years after the crime was committed. During this time, evidence has become stale, memories have faded, and

witnesses may no longer be available. See *State* v. *Coleman*, 202 Conn. 86, 91, 519 A.2d 1201 (1987) (noting that unduly delayed trial creates "potential for *inaccuracy* and *unfairness* that stale evidence and dull memories may occasion" (emphasis in original; internal quotation marks omitted)). Requiring the state to negotiate at such a disadvantage, and actually proceed to trial if the plea negotiations were unsuccessful, would be fundamentally unfair to the state, which, according to the petitioner's own trial counsel, had a significant likelihood of securing a conviction against the petitioner in 2004. This concern about fundamental fairness to both sides further supports our decision to leave undisturbed the parties' original allocation of risk in the plea agreement and to require the petitioner to perform his obligations accordingly.

In addition, because our Supreme Court repeatedly has refused to adopt the amelioration doctrine, it would be improper to vacate the petitioner's guilty plea pursuant to the frustration of purpose doctrine in this instance where it would accomplish the same objective. In *State* v. *Kalil*, 314 Conn. 529, 107 A.3d 343 (2014), our Supreme Court discussed that doctrine and declined to adopt it, stating: "In criminal cases, to determine whether a change in the law applies to a defendant, we generally have applied the law in existence on the date of the offense . . . . This principle is derived from the legislature's enactment of saving statutes such as General Statutes § 54-194, which provide that [t]he repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect . . . . The amelioration doctrine, [however], provides that amendments to statutes that lessen their penalties are applied retroactively . . . . [T]his court has not previously held that ameliorative changes to criminal statutes apply retroactively . . . and we decline to do so in the present case because the doctrine is in direct contravention of Connecticut's savings statutes." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 552–53; see also *State* v. *Bischoff*,     Conn.    ,     A.3d     (2021) (declining invitation to overrule *Kalil* and adopt amelioration doctrine).

By holding that the petitioner cannot withdraw his guilty plea and be resentenced in accordance with the plea that would have been negotiated if the death penalty had been unavailable, we are effectively requiring adherence to the law that was in existence on the date of the offense. Stated differently, to allow the petitioner to be resentenced, in accordance with the plea that would have been negotiated if the death penalty was not available at the time of the offense, would be the functional equivalent of applying the amelioration doctrine because it would allow the petitioner to benefit

from the retroactive application of a law that lessened the penalty for the crimes for which he originally was charged. Because our Supreme Court unequivocally has rejected the amelioration doctrine, it likewise is proper for us to decline the petitioner's invitation to reach the same result by virtue of the frustration of purpose doctrine.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court granted the petitioner certification to appeal from the judgment.

[2] Specifically, the petitioner challenges the habeas court's conclusion that he failed to satisfy two of the four prongs of the frustration of purpose test: (1) the event substantially frustrated his principal purpose for entering into the plea agreement; and (2) he did not assume the risk that the event would occur.

[3] We rely on the facts as found and as set forth by the habeas court in its memorandum of decision as well as on undisputed facts disclosed in the record.

[4] The law in existence at the time was as follows: "Capital felony trials are divided into two phases: the guilt phase and the penalty phase. . . . In the penalty phase . . . the jury is charged with both fact-finding and non-fact-finding tasks. . . . Its fact-finding task involves determining whether the state has established the facts of an aggravant beyond a reasonable doubt and whether the defendant has established the facts of a mitigant by a preponderance of the evidence. . . . Its nonfact-finding task involves determining, based on its reasoned and moral judgment, whether: (1) the factually established mitigant is mitigating in nature; and (2) the aggravant outweighs the mitigant. . . . Following this weighing process, the jury must ultimately determine whether the defendant shall live or die, which requires the jury to make a reasoned moral and individualized determination that death is the appropriate punishment in the case." (Citations omitted; internal quotation marks omitted.) *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 664 n.6, 155 A.3d 772, cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017).

Moreover, the sentencing statute for capital felonies committed prior to April 25, 2012, General Statutes § 53a-46a, provides in relevant part: "(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime . . . the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." In addition, the aggravating factors to be considered include, inter alia, whether "the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ." General Statutes § 53a-46a (i) (4).

[5] The petitioner was thirty years old when he was arrested. Attorney Butler noted that, in light of his age, a sixty year sentence is effectively a life sentence.

[6] The court denied the respondent's motion to dismiss in the same decision, finding that there was no procedural default on the petitioner's part. In addition, with regard to habeas jurisdiction, the court determined that because the petitioner is seeking a judgment vacating his conviction, if he proves his claim "it may warrant habeas relief." The court also suggested that habeas review is proper because the petitioner's claim, like claims of ineffective assistance of counsel, requires further record development, including testimony about the intent of the parties in entering into the agreement and their assumptions of risk while doing so, and "this cannot be discerned from the record of the trial proceedings below." Specifically, the court reasoned "our courts have a well established practice of deferring review . . . to collateral review by habeas corpus in order to allow for

necessary record development." (Internal quotation marks omitted.) On appeal, the respondent does not contend that the habeas court improperly determined that it had jurisdiction over the amended petition, therefore, we do not address this issue further.

[7] Specifically, the court found that "the [petitioner's] purposes for entering into this plea were to avoid the death penalty *and to avoid a conviction on a sexual assault charge*." (Emphasis added.) Moreover, the court reasoned that performance of the agreement "is not worthless" to the petitioner because "he still avoids a sexual assault conviction and a potential sentence of up to 100 years."

[8] The court concluded that the petitioner had satisfied the other two prongs of the test, namely (1) the nonoccurrence of the supervening event was a basic assumption on which the contract was made, and (2) the frustration resulted without the fault of the party seeking to be excused. See *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 315 Conn. 596, 605, 109 A.3d 473 (2015).

[9] The paradigmatic example of an instance in which a party is entitled to relief under the frustration of purpose doctrine is *Krell* v. *Henry*, 2 K.B. 740 (1903), the case in which this doctrine was first recognized. See *DDS Wireless International, Inc.* v. *Nutmeg Leasing, Inc.*, 145 Conn. App. 520, 526, 75 A.3d 86 (2013). In *Krell*, a spectator entered into a contract to rent an apartment for the purpose of viewing the procession for the coronation of King Edward VII. See id. The king became ill, the procession was cancelled, and the spectator refused to pay for the rental. See id. When the apartment owner sued for breach of contract, the court excused the spectator's breach, holding that the coronation procession was the foundation of the contract. See id. "The court implicitly determined that had the parties contemplated the possibility of the coronation being cancelled, they would have included a provision in the contract allowing the spectator to terminate the contract under those circumstances." Id.

[10] The petitioner's trial counsel, Attorney Fred DeCaprio, testified, and the habeas court made a factual finding, that one of the petitioner's considerations with regard to pleading guilty included avoiding the stress of a capital trial on himself and his family.

[11] The petitioner argues that he did not assume the risk of the abolition of the death penalty because this topic was not explicitly discussed during the court's canvass of him. In essence, the petitioner argues that, in the absence of a specific provision of his plea agreement that required him to serve the agreed upon sentence even if the death penalty was later abolished, he cannot be deemed to have assumed that risk. We disagree.

"[A] voluntary and intelligent guilty plea operates as a waiver of all nonjurisdictional defects. . . . A plea of guilty is, in effect, a conviction, the equivalent of a guilty verdict by a jury. . . . In choosing to plead guilty, the defendant is waiving several constitutional rights . . . . The . . . constitutional essentials for the acceptance of a plea of guilty are included in our rules and are reflected in Practice Book §§ [39-19 and 39-20]. . . . The failure to inform a defendant as to all possible indirect and collateral consequences does not render a plea unintelligent or involuntary in a constitutional sense." (Citation omitted; internal quotation marks omitted.) *State* v. *Reid*, 277 Conn. 764, 780, 894 A.2d 963 (2006).

Specifically, "[t]he rules governing the acceptance of guilty pleas, set forth in Practice Book §§ 39-19 and 39-20, provide that the trial court must not accept a guilty plea without first addressing the defendant personally in open court and determining that the defendant fully understands the items enumerated in § 39-19, and that the plea is made voluntarily pursuant to § 39-20. There is no requirement, however, that the defendant be advised of every possible consequence of such a plea. . . . Although a defendant must be aware of the direct consequences of such a plea, the scope of direct consequences is very narrow. . . . In Connecticut, the direct consequences of a defendant's plea include only the mandatory minimum and maximum possible sentences; Practice Book § [39-19 (2) and (4)]; the maximum possible consecutive sentence; Practice Book § [39-19 (4)]; the possibility of additional punishment imposed because of previous conviction(s); Practice Book § [39-19 (4)]; and the fact that the particular offense does not permit a sentence to be suspended. Practice Book § [39-19 (3)] . . . ." (Internal quotation marks omitted.) *State* v. *Greene*, 274 Conn. 134, 145, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006). Here, the court's canvass was more than adequate. The canvass went beyond apprising the petitioner of the direct consequences of his plea, even though it was not required to do so.

Moreover, the authority on which the petitioner premises his argument does not set forth the stringent standard for which he advocates. It merely requires the state, "as the drafting party wielding disproportionate power, [to] memorialize any and all obligations for which it holds the defendant responsible. . . . The terms of the agreement should be stated clearly and unambiguously, so that the defendant . . . knows what is expected of him and what he can expect in return." *State* v. *Kallberg*, supra, 326 Conn. 23. *Kallberg* also is factually distinguishable, in that the terms of the plea agreement at issue there were ambiguous. See id., 19. In contrast, the terms of the agreement here unambiguously set forth the petitioner's obligations, specifically that once the court accepted the petitioner's guilty plea and sentenced him to the agreed upon sixty year term of incarceration, he was waiving his right to appeal, prohibited from withdrawing his plea regardless of whether he later changed his mind, and required to serve every day of his sixty year sentence. The state is not required to specifically address all possible contingencies in a plea agreement, particularly when the terms of the agreement make clear that the parties intended for any such future events to not affect the petitioner's obligations.

[12] That Attorney Butler discussed this possibility with the petitioner is one of the habeas court's findings of fact. The court went on to conclude, with regard to the second prong of the frustration of purpose doctrine, that the abolition of the death penalty was not reasonably foreseeable, was not contemplated, and could not have been anticipated by the parties. We do not need to address the propriety of those conclusions in light of our determination that the petitioner has not satisfied the assumption of risk prong of the frustration of purpose doctrine.

[13] Title 28 of the United States Code, § 2255, provides in relevant part: "(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without justification to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

[14] The defendants in these cases did not base their claims on the frustration of purpose doctrine. Instead, they all argued that their guilty pleas were rendered involuntary by a subsequent change in the law that made the death penalty inapplicable to them. Here, the petitioner makes no such claim regarding the voluntariness of his plea. Nevertheless, the reasoning underlying these cases applies with equal force here.