# AGW SONO PARTNERS, LLC *v.* DOWNTOWN SOHO, LLC, ET AL.
## (SC 20625)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendants, D Co., and its managing member, E, in connection with D Co.'s breach of a commercial lease agreement for certain premises, which D Co. used to operate a restaurant and bar. D Co. had entered into a ten year lease agreement with T Co., the plaintiff's predecessor-in-interest. E subsequently executed a separate agreement with T Co., pursuant to which E personally guaranteed all of D Co.'s obligations under the lease agreement. The plaintiff later purchased the premises from T Co. and was assigned all of T Co.'s rights and obligations under the lease and guarantee agreements. The lease agreement contained provisions requiring D Co. to use the premises only for the operation of a restaurant and bar selling food and beverages and to bear the burden of complying with all applicable laws and regulations. It also required D Co. to pay the plaintiff monthly rent and a certain percentage of its gross annual sales. D Co. failed to make timely lease payments in January and February, 2020, but cured each of those defaults. D Co. then defaulted a third time in March, 2020. Around that time, the COVID-19 pandemic emerged, and the governor proclaimed civil preparedness and public health emergencies on March 10, 2020. The governor then issued a series of executive orders that closed restaurants and bars to in person business through May 20, 2020, restricted restaurants to outdoor dining and on premises alcohol consumption through June 16, 2020, and then allowed restaurants to resume indoor dining only at 50 percent capacity. D Co.'s restaurant was closed entirely between March 11 and May 27, 2020, and then opened for outdoor dining and subsequently for limited indoor dining. Whereas D Co.'s restaurant previously had a capacity of more than 140 patrons, upon reopening, indoor capacity was limited to approximately 25 persons, including staff. The restaurant was operating at a loss, and D Co. did not make any rental payments after February, 2020. D Co. vacated the premises in September, 2020, in response to a notice to

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

quit, and the plaintiff immediately began searching for a new tenant. S
Co. signed a ten year lease for the premises on November 30, 2020, with
occupancy commencing in January, 2021. S Co.'s monthly rental payment
was less than what D Co. had been paying, and the plaintiff granted S
Co. a concession of six months' free rent. The plaintiff alleged that D
Co. had breached the lease agreement and had been unjustly enriched
by virtue of its continued use of the premises for months after defaulting,
and that E had breached his obligations under his agreement to guarantee
D Co.'s obligations under the lease. In response, the defendants raised
various special defenses, including the doctrines of impossibility of
performance and frustration of purpose, owing to the adverse effects
of the executive orders on the restaurant and hospitality industry. After
a trial to the court, the trial court found for the plaintiff on all three counts
and rejected the defendants' special defenses. The court concluded that
the defendants had not proven, by a fair preponderance of the evidence,
that the executive orders had rendered the operation of a restaurant
impossible or frustrated the purpose of the lease agreement. The court
reasoned that, although the pandemic was unforeseeable, the lease
agreement allocated to D Co. the burden of complying with the executive
orders, that the lease agreement did not require the operation of a
profitable restaurant, and that none of the executive orders specifically
made the operation of a restaurant impossible, especially in light of
takeout and curbside options. With respect to damages, the court
awarded the plaintiff, inter alia, damages for unpaid lease payments
from March through December, 2020, around the time when S Co. signed
its lease. Although the court credited evidence that the plaintiff had
made efforts to mitigate its damages by securing S Co. as a new tenant,
it found that the plaintiff had presented no evidence of its negotiations
with S Co. to determine whether further negotiations could have resulted
in a lease with terms similar to or the same as those in the defendants'
lease. From the judgment rendered thereon, the defendants appealed
and the plaintiff cross appealed. *Held*:

1. The defendants could not prevail on their claim that the trial court incor-
rectly had concluded that they failed to establish, by a preponderance
of the evidence, the special defenses of impossibility and frustration
of purpose:

a. The trial court correctly determined that the various executive orders
restricting the operation of D Co.'s restaurant did not render performance
of the lease agreement impossible as a matter of law: only in the most
exceptional circumstances will a contractual duty be discharged because
additional financial burdens make performance less practical than ini-
tially contemplated, a party who makes an unqualified promise to perform
necessarily assumes an obligation to perform, even if the occurrence of
a foreseeable event makes performance impracticable, and the impossi-
bility doctrine does not apply when the contract explicitly assigns a
particular risk to one party; in the present case, the impossibility doctrine

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

did not excuse D Co. from its obligations to the plaintiff under the lease agreement because, even under the most restrictive executive orders closing restaurants entirely to indoor dining, use of the premises for the purpose of operating a restaurant was not rendered impossible insofar as restaurants were permitted to provide curbside or takeout service; moreover, the lease agreement did not prohibit D Co. from offering such curbside or takeout service, and, although the pandemic restrictions had serious economic consequences for the viability of the restaurant, they did not, by themselves, make performance under the lease agreement impossible or commercially impracticable but, instead, simply raised the cost of performance for D Co. in a manner that rendered performance highly burdensome but not factually impossible; furthermore, the language of the lease agreement suggested that events of the magnitude of the COVID-19 pandemic were not entirely unforeseeable, and the lease agreement, to the extent that it contemplated a crisis situation beyond the parties' control, excused only the plaintiff's obligations while squarely tasking D Co. with the obligation of complying with all governmental laws, orders and regulations.

b. The trial court correctly determined that the shutdown and restrictions compelled by the pandemic related executive orders did not frustrate the purpose of the lease agreement, which the defendants claimed was the operation of a "first-class" restaurant with indoor, on premises dining and bar service: establishing the frustration of purpose defense requires convincing proof of a changed situation so severe that it is not fairly regarded as being within the risks assumed under the contract, and, in light of the narrow construction afforded to the doctrine so as to preserve the certainty of contracts, this court could not conclude that the purpose of the parties' lease agreement was frustrated by the pandemic restrictions imposed by the executive orders, as even the most restrictive of the executive orders barring indoor dining entirely did not render the lease agreement valueless insofar as it did not preclude takeout or outdoor dining, which services D Co. ultimately provided.

2. The trial court improperly assigned the plaintiff, as the nonbreaching party, the burden of proving that it had mitigated its damages, and, accordingly, this court reversed the judgment with respect to the trial court's damages award and remanded the case for further proceedings as to damages: consistent with well established principles of damages law, as well as this court's precedent in the contexts of tort and contract law, this court concluded that, when a lessee has breached a lease agreement, the lessee bears the burden of proving that the lessor failed to undertake commercially reasonable efforts to mitigate its damages; in the present case, the trial court, in determining the damages to which the plaintiff was entitled, stopped the accrual of monthly rent damages in December, 2020, even though S Co. was not set to occupy the premises under its lease until January, 2021, and noted that the plaintiff had presented no evidence of its negotiations with S Co. and that it could

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

only speculate if further negotiations with S Co. would have resulted in a lease with the same or similar terms to those in the defendants' lease; moreover, by engaging in the foregoing speculation in connection with reducing the contract damages that it ultimately awarded to the plaintiff, the trial court effectively relieved the defendants of their burden of proving that the plaintiff's efforts were, in fact, commercially unreasonable under the circumstances; accordingly, a new hearing in damages was required.

Argued November 16, 2021—officially released May 10, 2022

### *Procedural History*

Action to recover damages for, inter alia, breach of a lease agreement, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, Housing Session at Norwalk, and tried to the court, *Spader, J.*; judgment for the plaintiff, from which the defendants appealed and the plaintiff cross appealed. *Reversed in part*; *further proceedings*.

*Philip Russell*, with whom, on the brief, was *Catherine R. Keenan*, for the appellants-cross appellees (defendants).

*Andrew B. Nevas*, with whom, on the brief, was *Travis K. Waller*, for the appellee-cross appellant (plaintiff).

### *Opinion*

ROBINSON, C. J. In the earliest months of the COVID-19 public health emergency, Governor Ned Lamont issued numerous executive orders that closed or severely restricted the operation of various businesses, including bars and restaurants, in order to stem the spread of the virus at that time. This appeal requires us to consider how those executive orders affected the enforceability of a commercial lease agreement for premises in South Norwalk that the defendants, Downtown Soho, LLC (Downtown Soho), and Edin Ahmetaj, leased from the plaintiff, AGW Sono Partners, LLC, for their fine dining restaurant. The defendants appeal, and the plaintiff cross

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

appeals,[1] from the judgment of the trial court awarding
the plaintiff $200,308.76 in damages for the defendants'
breach of that lease agreement. In their appeal, the defen-
dants claim, inter alia, that the trial court incorrectly
concluded that the common-law doctrines of impossibil-
ity and frustration of purpose did not relieve them of
their obligations under the lease agreement, given the
damaging economic effects of the various executive
orders on their restaurant's business. In its cross appeal,
the plaintiff claims that, in calculating the damages award,
the trial court improperly allocated the burden of proof
in determining whether the plaintiff had mitigated its
damages when it leased the premises to a new tenant at
a lesser rent than the defendants had paid. We conclude
that the trial court correctly determined that the eco-
nomic effects of the executive orders did not relieve the
defendants of their obligations under the lease agreement
but that a new damages hearing is required because the
trial court improperly allocated the burden of proof as
to mitigation in determining the damages award. Accord-
ingly, we reverse in part the judgment of the trial court.

The record reveals the following facts, as found by the
trial court, and procedural history. In December, 2018,
TR Sono Partners, LLC (TR Sono), entered into a lease
agreement with Downtown Soho, under which Down-
town Soho would use and occupy premises located
at 99 Washington Street in South Norwalk (premises) for
a ten year period beginning on January 1, 2019. Section
4 (a) of the lease agreement provides in relevant part
that the defendants "shall use the [p]remises for the oper-
ation of a restaurant and bar selling food, beverages, and
related accessories, together with uses incidental thereto,
and for no other purpose. . . .''[2] Under the terms of the

_____

[1] The defendants appealed, and the plaintiff cross appealed, from the
judgment of the trial court to the Appellate Court, and we transferred the
appeal and cross appeal to this court pursuant to General Statutes § 51-199
(c) and Practice Book § 65-1.

[2] Section 1 (o), in the definitions section of the lease agreement, provides
similarly to § 4 (a), but differs slightly insofar as it states that the premises

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

lease agreement, Downtown Soho was obligated to pay both base monthly and percentage rent,[3] along with additional rent to cover its apportioned amounts of the plaintiff's insurance, common area expenses and real estate taxes, commencing on July 1, 2019, and concluding on December 31, 2028. On December 20, 2018, Ahmetaj, who is the managing member of Downtown Soho, executed a guarantee agreement pursuant to which he personally guaranteed all of Downtown Soho's obligations under the lease agreement. In December, 2019, the plaintiff purchased six commercial properties, including the premises, from TR Sono, which assigned all of its rights and obligations under the lease and guarantee agreements for those properties to the plaintiff.

The defendants operated a fine dining restaurant known as Blackstones Bistro (bistro) on the premises. Most of the bistro's business came during dinner service, when an average seating would generate a bill of $100 to $200 per patron, given bar service and dishes priced on average between $35 and $60 each. The upscale bar supported the restaurant side of the business and occupied approximately 40 percent of the premises' total rental space. Prior to the COVID-19 pandemic, the bar was busy and could accommodate sixty customers by providing more than twenty-eight seats at the bar plus standing room for crowds.

The defendants first defaulted on their payment obligations under the lease agreement in January, 2020, by

are "to be used as for the operation of a *first-class* restaurant and bar selling food, beverages, and related accessories, together with uses incidental thereto, and for no other purpose." (Emphasis added.)

[3] The lease agreement provides that the base monthly rent amounts would increase over the duration of the ten year term, starting at a rate of $9,333.33 per month for the period between July 1 and December 31, 2019, and increasing each year, and culminating at a rate of $12,177.88 per month for the final year, ending on December 31, 2028. In addition to the base monthly rent amounts, Downtown Soho also was obligated to pay the plaintiff, on an annual basis, 5 percent of the amount of its gross annual sales that exceeded $2.5 million.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

making only half the required monthly rent payment; they cured that default in February, 2020, by making payment within two weeks of receiving a default notice from the plaintiff. The defendants then defaulted on their February, 2020 obligations, which they cured one week later. Subsequently, Ahmetaj met with Adam Greenbaum, the plaintiff's manager, to discuss the defaults; Ahmetaj informed Greenbaum that the defaults resulted from slower winter business and would cease when business improved during the warmer months, and that he was surprised that the plaintiff, unlike TR Sono, did not accept late payments given the seasonal nature of the restaurant business in the Norwalk area.

The defendants defaulted on the lease agreement a third time the next month, and the plaintiff sent them a default notice on March 11, 2020; the defendants did not cure that default. On March 10, 2020, Governor Lamont acted, pursuant to General Statutes §§ 19a-131a and 28-9, and issued a Declaration of Public Health and Civil Preparedness Emergencies (declaration) because of the COVID-19 outbreak[4] in the United States and in Connecticut, specifically.[5] Pursuant to the declaration, Governor Lamont then issued several executive orders that affected the operation of bars and restaurants. First, on March 16, 2020, Governor Lamont issued Executive Order No 7D,[6] which, inter alia, closed bars and

---

[4] "COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death, and public health experts have indicated that persons infected with COVID-19 may not show symptoms, and transmission or shedding of the coronavirus that causes COVID-19 may be most virulent before a person shows any symptoms . . . ." (Internal quotation marks omitted.) *Fay* v. *Merrill*, 338 Conn. 1, 7, 256 A.3d 622 (2021).

[5] The declaration was subsequently renewed on September 1, 2020, and extended on February 9, 2021.

[6] Executive Order No. 7D, issued on March 16, 2020, provides in relevant part: "Limits on Restaurant, Bar and Private Club Operations. Effective at 8 p.m. on March 16, 2020 and through April 30, 2020, unless earlier modified, extended, or terminated by [the governor], any restaurant or eating establishment and any location licensed for [on premises] consumption of alcoholic liquor in the [s]tate . . . except for Class III and Class II Tribal Gaming enterprises, shall only serve food or [nonalcoholic] beverages for [off premises] consumption. . . ."

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

restaurants to in person business from that day through April 30, 2020; the subsequent Executive Order No. 7X[7] extended that ban through May 20, 2020. Executive Order No. 7PP,[8] issued on May 18, 2020, allowed restaurants to offer outdoor dining and on premises alcohol consumption beginning on May 20, 2020, and, on June 16, 2020, Executive Order No. 7ZZ[9] allowed restaurants

---

[7] Executive Order No. 7X, issued on April 10, 2020, provides in relevant part: "Extension of Closures, Distancing, and Safety Measures Through May 20, 2020. The orders to prevent transmission of COVID-19 through appropriate distancing and other safety measures listed below are extended through May 20, 2020:

"a. Executive Order No. 7D . . . imposing limits on restaurant, bar, and private club operations. . . ."

[8] Executive Order No. 7PP, issued on May 18, 2020, provides in relevant part: "1. Phase 1 Business Reopening. To provide for a comprehensive plan for safe resumption of limited social, recreational, athletic, and economic activity, pursuant to rules issued by the Department of Economic and Community Development for each of various business sectors (individually and collectively, the 'Sector Rules'), which Sector Rules shall constitute legally binding guidance, the following [e]xecutive [o]rders are repealed or amended effective at 12:01 a.m. on Wednesday, May 20, 2020, as provided herein:

"a. Reopening of Outdoor Dining. Executive Order No. 7D . . . is amended to provide that outdoor dining shall be permitted at any restaurant, eating establishment, private club, or any location licensed for [on premises] consumption of alcohol, in accordance with the provisions of Executive Order No. 7MM and the Sector Rules for Restaurants, as amended from time to time, and any [e]xecutive [o]rder governing the sale or service of alcoholic beverages. Alcoholic beverages shall not be served except in conjunction with the sale of food in accordance with the provisions of Executive Order No. 7MM. The remaining provisions of Executive Order No. 7D . . . which prohibits indoor dining and, which, as amended, prohibits the sale of alcohol by such permittees without the sale of food, are extended through June 20, 2020. The provisions of Executive Order No. 7N . . . establishing rules for restaurant takeout and delivery, shall remain in effect. . . ."

[9] Executive Order No. 7ZZ, issued June 16, 2020, provides in relevant part: "Resumption of Indoor Dining Pursuant to Sector Rules for Restaurants. Executive Order No. 7D . . . is amended to permit indoor dining pursuant to the . . . Sector Rules for Restaurants, as amended from time to time, which Sector Rules shall be legally binding and enforceable. The remaining provisions of Executive Order No. 7D . . . which prohibit the sale of alcohol by certain permittees without the sale of food, shall remain in effect and are extended through July 20, 2020. The provisions of Executive Order No. 7N . . . establishing rules for restaurant takeout and delivery, shall remain in effect."

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

to resume providing indoor dining at 50 percent capacity.[10]

The bistro was completely closed between March 11 and May 27, 2020. Downtown Soho had no income and could not pay rent during that period of time. Although the lease agreement did not prohibit takeout or delivery dining or restrict the restaurant's operation to dine in business only, Ahmetaj testified that it was not profitable when the bistro attempted to do so. After obtaining a permit from the city of Norwalk, Downtown Soho reopened the bistro for outdoor dining on May 28, 2020. Subsequently, during the summer of 2020, the bistro was open for indoor dining. As the trial court found, the nine foot social distancing requirements imposed at that time by the city of Norwalk[11] had a significant

_____

[10] We note that, in March and April of 2020, Governor Lamont issued several other executive orders that also affected the restaurant industry. Executive Order No. 7F closed large shopping malls and places of public amusement but permitted restaurants and bars that are attached to shopping malls with separate external entrances to remain open for takeout service. Executive Order No. 7G modified Executive Order No. 7D by allowing restaurants, bars or alcoholic beverage manufacturers with active liquor permits to sell certain sealed containers of alcoholic beverages for off premises consumption. Executive Order No. 7N required restaurants and bars open for the sale of food for takeout to minimize the entrance of customers into their establishments and to use, to the extent possible, remote ordering or touchless payment systems to minimize contact. Executive Order No. 7T expanded options under Executive Order No. 7G for delivery of sealed alcoholic beverages to customers by existing permit holders.

Subsequently, in May, 2020, Governor Lamont issued Executive Order No. 7MM, which facilitated Executive Order No. 7PP; see footnote 8 of this opinion; insofar as it suspended and modified state and municipal laws, ordinances and regulations in order to allow for outdoor dining, alcoholic beverage service, and retail activities, and to expedite the associated state and local approval processes.

[11] Under the nine foot social distancing requirements, the bistro could provide only seven bar seats and eight indoor dining tables. The city of Norwalk did not allow the defendants to use floor space in the bar area, which constituted nearly 40 percent of the restaurant's square footage, for additional dining tables. The outdoor dining space of the restaurant could accommodate only six tables, with up to six patrons at each table, generally restricting capacity to twenty-two to twenty-five persons outside.

effect on the usage of the restaurant space because, "[p]repandemic, [more than] 140 patrons could enjoy the space, [whereas] after the pandemic, about a maximum of twenty-five individuals, including staff, could be inside. At best, operating the business meant operating at a loss." This was compounded by the fact that alcoholic beverage sales remained limited to those customers who had purchased food. See Executive Order No. 7PP; footnote 8 of this opinion.

The defendants did not make any rental payments after March, 2020. During the pandemic, Ahmetaj again spoke with Greenbaum and asked that the plaintiff forgive rent for the months of March, April, and May, 2020, with full payments to begin in June, 2020. The plaintiff declined that offer because the defendants had refused its request to make some partial payment as a show of good faith, particularly when they had been in default under the lease agreement even prior to the pandemic restrictions.[12] Subsequently, the plaintiff served a notice to quit, demanding that Downtown Soho vacate the premises on or before June 12, 2020; the plaintiff commenced a separate summary process action shortly thereafter. Downtown Soho vacated the premises by September 11, 2020.

_____

[12] The relationship between the parties had grown acrimonious by this time. Ahmetaj testified that, at the time of trial, he owned two other bars, which were fully closed, and two other restaurants, which were able to operate at a break-even level given rent reduction accommodations provided by the landlords at those locations. Ahmetaj also testified that his conversations with Greenbaum led him to understand that the plaintiff wanted to replace the defendants with a new tenant prior to the pandemic. During those discussions, Ahmetaj informed Greenbaum that Downtown Soho would leave if the plaintiff paid the defendants $250,000 to vacate the premises. The plaintiff refused that demand.

Greenbaum testified that the plaintiff had, however, negotiated concessions with other tenants that were experiencing pandemic related financial difficulties by obtaining a partial payment up front, with portions of their monthly rents deferred to a later time. Greenbaum testified that most of the plaintiff's other tenants were able to continue to pay their monthly rents in full at that time.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

The plaintiff immediately began marketing the space for new tenants. On November 30, 2020, the plaintiff entered into a ten year lease agreement for the premises with a new tenant, Sono Boil, Inc. (Sono Boil). Sono Boil planned to renovate the premises and to operate a full service restaurant there. The rent for Sono Boil's lease was $12,500 per month, including base rent and the additional rent for reimbursement of property taxes and common area expenses, which was less than the defendants had been paying. To entice Sono Boil to sign a lease, the plaintiff provided it with a concession of free rent for the first six months of the lease. The plaintiff did not offer a similar concession or lease terms to the defendants in order to allow them to stay.

The plaintiff brought this action against the defendants seeking money damages. In the first two counts of the three count complaint, the plaintiff alleged that Downtown Soho had breached the lease agreement and been unjustly enriched by occupying the premises without paying for that benefit. In the third count, the plaintiff alleged that Ahmetaj had breached his guarantee obligations. In response, the defendants raised various special defenses, including the doctrines of impossibility of performance and frustration of contract, relying on the purpose of the lease agreement, namely, " 'the operation of a first class restaurant and bar,' " and the adverse effects of the various executive orders on the restaurant and hospitality industry. The defendants also claimed that the executive orders rendered the lease agreement illegal as a matter of law.

After a one day trial to the court, at which Ahmetaj and Greenbaum testified, the trial court issued a memorandum of decision, finding that the plaintiff had established its claims of breach of the lease agreement, unjust enrichment, and breach of guarantee. Turning to the special defenses, the trial court concluded that the defendants had not proven, by a fair preponderance of

the evidence, that the executive orders rendered the operation of a restaurant impossible, impracticable or illegal, and had not frustrated the purpose of the lease agreement. Emphasizing that § 4 (d) of the lease agreement required the defendants to bear the risk of complying with applicable laws and regulations,[13] the trial court concluded that the "pandemic . . . was certainly an unforeseen event, but compliance with the governmental orders in response thereto was an expense allocated to the defendants in the lease [agreement]. The defendants claim that they were operating at a loss until the business ultimately closed. It is clear that [the bistro] would not immediately 'look' on the inside like it did prior to the pandemic, with a crowd enjoying [its] sorely missed cuisine, but the law, and the lease [agreement], did not require the defendant[s] to operate a *profitable* bar/restaurant, just a bar/restaurant. Certainly, fine dining as takeout is a difficult sell, but not illegal [or] impossible. . . . None of the executive orders specifically made the operation of a restaurant 'illegal' or 'impossible.' " (Emphasis in original.) The trial court further observed that the "purpose of the lease [agreement] was not frustrated [but, rather], the [defendants'] profitability for continuing that purpose was frustrated. It is a key distinction that causes this defense to fail."

The trial court then considered damages, observing that, "[i]n a commercial lease, the defendant is usually responsible for the full amount of the lease less the amounts the plaintiff was able to mitigate with the new lease." It then found that, "[a]lthough the defendant[s]

---

[13] Section 4 (d) of the lease agreement provides in relevant part that the defendants, at their "expense, shall comply with all laws, orders and regulations of [f]ederal, [s]tate and municipal authorities and with any direction of any public officer or officers, pursuant to [l]aw, which shall impose any violation, order or duty upon [l]andlord or [t]enant with respect to the use or occupancy thereof by [t]enant or [t]enant's [r]epresentatives, including, without limitation, the Americans with Disabilities Act . . . and any [e]nvironmental [l]aws . . . ."

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

vacated [the premises on] September 11, 2020, [they] did not provide any funds toward rent, use and occupancy or reimbursements since February, 2020. The new lease was signed in December, 2020, with the new tenant beginning occupancy in January, 2021. The lease is at a slightly lower monthly rent to reflect the new economic conditions.'' In calculating the damages, the trial court credited the plaintiff for mitigating its damages by "quick[ly] obtaining . . . a new tenant,'' Sono Boil, but it observed that "no evidence of the negotiations with [Sono Boil] was presented in detail by the plaintiff. The court can only speculate if further negotiations with [Sono Boil] could have resulted in a lease with the same terms the defendants' lease had. Certainly, the six month [rent] concession [given to Sono Boil] was similar to that enjoyed by the defendants . . . at the start of [their] lease [agreement] and is not unusual, but the court is going to terminate the accrual of damages [with the] December, 2020 rent. [Sono Boil] took possession on or about January 1, 2021. The court will allow the leasing [broker's] commission as an expense, as it would not have been incurred had the defendants fulfilled their obligations.''[14] Accordingly, the trial court rendered judgment for the plaintiff and awarded it $200,308.76 in damages.[15] This appeal and cross appeal followed.

On appeal, the defendants claim that the trial court improperly interpreted and applied the special defenses

---

[14] The trial court rejected the defendants' fourth special defense, namely, that the plaintiff's damages had been offset by "multiple forms of relief from the federal government in the form of subsid[ies], tax relief and mortgage relief,'' which should be considered in calculating any damages owed to the plaintiff. The defendants do not challenge this conclusion on appeal, and we need not consider this special defense further.

[15] We note that the trial court's total damages award of $200,308.76 reflected the following components: (1) unpaid rent, use and occupancy for ten months, from March, 2020, through December, 2020, in the amount of $137,774.30; (2) utility bills of $2,013.88 and $3,005.20; (3) the leasing agent's commission on the new lease in the amount of $41,933; (4) reasonable attorney's fees in the amount of $14,775; and (5) costs in the amount of $807.38.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

of impossibility and frustration of purpose.[16] In its cross appeal, the plaintiff claims that the trial court improperly declined to award it the full difference in value between the defendants' lease agreement and that of the new tenant, Sono Boil.

I

SPECIAL DEFENSE CLAIMS

Before turning to the defendants' specific claims with respect to the contract defenses of impossibility and frustration of purpose,[17] we set forth the applicable legal principles and standard of review. "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. . . . The interpretation of definitive contract language is a question of law over which our review is plenary. . . . By contrast, the trial court's factual findings as to whether and by whom a contract has been breached are subject

---

[16] We note that the defendants also claim that the trial court should have reduced the damages award proportionately because the various space and capacity restrictions that were in effect after the bistro reopened on May 28, 2020, meant that it did not have "exclusive occupancy" of the premises, rendering the trial court's finding of exclusive possession clearly erroneous. Insofar as this claim appears to pertain only to the unjust enrichment count of the complaint, we need not reach it given the independent basis for liability under the breach of contract count. See, e.g., *Russell* v. *Russell*, 91 Conn. App. 619, 638, 882 A.2d 98 ("unjust enrichment and breach of contract are mutually exclusive theories of recovery"), cert. denied, 276 Conn. 924, 888 A.2d 92, and cert. denied, 276 Conn. 925, 888 A.2d 92 (2005). To the extent it is at all relevant to the trial court's calculation of damages, we leave that to the new damages hearing to be held on remand. See part II of this opinion.

[17] Although the relevant headings in the defendants' brief state that the trial court improperly applied the doctrine of illegality in addition to the doctrines of impossibility and frustration of purpose, the defendants do not provide any factual or legal argument with respect to the doctrine of illegality. Accordingly, we agree with the plaintiff that any illegality claims are inadequately briefed and, therefore, abandoned for purposes of appeal. See, e.g., *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 805–806, 256 A.3d 655 (2021).

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

to the clearly erroneous standard of review and, if supported by evidence in the record, are not to be disturbed on appeal.'' (Citations omitted; internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 327 Conn. 114, 133, 172 A.3d 1228 (2017).

Moreover, a ''party raising a special defense has the burden of proving the facts alleged therein.'' (Internal quotation marks omitted.) *U.S. Bank, National Assn.* v. *Moncho*, 203 Conn. App. 28, 46, 247 A.3d 161, cert. denied, 336 Conn. 935, 248 A.3d 708 (2021). ''Legally sufficient special defenses alone do not meet the defendant's burden. The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action.'' (Internal quotation marks omitted.) Id.; see, e.g., *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 308 Conn. 719, 736–37, 66 A.3d 848 (2013). On appeal, we engage in plenary review of the trial court's conclusions of law with respect to special defenses and review factual determinations for clear error. See id.

As one federal court has aptly noted with respect to COVID-19, ''[t]hese times have not been easy for most people. And [although] some have had the good fortune to be able to continue to work during this unprecedented health crisis, others have not been as fortunate. . . . [B]usinesses that rely on the public such as theaters, restaurants, bars, hotels and the travel industry, as well as their landlords, have been hit particularly hard. And for the most part, the affected parties have tried to negotiate a resolution that is painful but practical to [e]nsure that 'on the other side' there will be something left. . . . But in the absence of [an] agreed [on] resolution, we are left with the resolutions that parties have bargained for in their contracts, or, [when] appropriate, the equitable remedies that [the] common law has fashioned.'' (Footnote omitted.) *In re Cinemex*

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

*USA Real Estate Holdings, Inc.*, 627 B.R. 693, 701 (Bankr. S.D. Fla. 2021). With this in mind, we consider whether the impossibility or frustration of purpose doctrines afford the defendants relief from their contractual obligations to the plaintiff.

A

Impossibility Doctrine

We begin with the defendants' claim that the trial court incorrectly concluded that they failed to demonstrate entitlement to relief from the lease agreement under the impossibility doctrine. They argue that the trial court improperly drew a distinction between the operation of a restaurant and the operation of a profitable restaurant in rejecting this special defense, emphasizing that, under *Dills* v. *Enfield*, 210 Conn. 705, 557 A.2d 517 (1989), impossibility calls for proof only of commercial impracticability as a result of unforeseen events, in this case, the restaurant closures resulting from the governmental response to the COVID-19 pandemic. In support of this argument, the defendants rely on a New York case, *Bush* v. *ProTravel International, Inc.*, 192 Misc. 2d 743, 753–54, 746 N.Y.S.2d 790 (2002), in which the court determined that there was a genuine issue of material fact as to whether a customer was excused from the performance of a travel contract in the wake of a lockdown of New York City after the September 11 terrorist attacks on the World Trade Center.[18] The defendants posit that, under the circumstances

[18] We note that the defendants also rely on a recent decision from a New York trial court, *267 Development, LLC* v. *Brooklyn Babies & Toddlers, LLC*, New York Supreme Court, Kings County, Docket No. 510160/2020 (March 15, 2021), which they argue stands for the proposition that the doctrine of impossibility barred an action against a retail clothing store that was in default of its rental obligations during the pandemic lockdowns in New York, insofar as the risk of the government shutdown was unforeseeable. See *Hugo Boss Retail, Inc.* v. *A/R Retail, LLC*, Docket No. 655166/2020, 2021 WL 2006877, *12 n.9 (N.Y. Sup. May 19, 2021) (decision without published opinion, 71 Misc. 3d 1222, 145 N.Y.S.3d 329) (describing and distinguishing *267 Development, LLC*). The defendants did not include a

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

created by the executive orders, "[t]he unforeseeable effect of the [COVID-19] pandemic on [their] business and [the] subsequent lack of profitability [were] no fault of [theirs], and the lease could not have been performed by any other party. As a result, [they are] excused from breach of the [lease agreement] as [it] became impossible and impracticable for [them] to perform."

In response, the plaintiff argues that the trial court correctly determined that impossibility depends both on whether the contract can be performed only " 'at an excessive and unreasonable cost' " *and* whether on the terms of the contract reflect consideration of the risk at issue. Citing several recent decisions from New York's federal and state courts considering the effect of the COVID-19 pandemic on the enforceability of commercial leases under the impossibility doctrine; see, e.g., *Gap, Inc.* v. *Ponte Gadea New York, LLC*, 524 F. Supp. 3d 224, 237–38 (S.D.N.Y. 2021); the plaintiff emphasizes that § 4 (d) of the lease agreement requires the tenant to bear the cost of legal and regulatory compliance with respect to the use of the premises. We agree with the plaintiff and conclude that the executive orders did not render performance of the lease agreement impossible as a matter of law.

"The doctrine of 'impossibility' has come to include 'physical impossibility,' 'frustration of purpose' and 'impracticability' because of contingencies rendering performance more costly." *Dills* v. *Enfield*, supra, 210

---

copy of the unreported decision in *267 Development, LLC*, in their appendix, which renders it difficult for us to consider this out-of-state trial court case that has been published or reported only on a limited basis. See Practice Book § 67-8 (b) (2) (applicable to appeals filed before October 1, 2021) ("[w]here an opinion is cited that is not officially published, the text of the opinion shall be included in part two of the appendix"). As described by the defendants and by the New York court in *Hugo Boss Retail, Inc.*, *267 Development, LLC*, appears distinguishable from the present case because it contemplated a complete shutdown of the subject business, as compared to the somewhat more limited restrictions at issue in the present case.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

Conn. 717 n.16. It "represents an exception to the accepted maxim of pacta sunt servanda [agreements must be kept], in recognition of the fact that certain conditions cannot be met because of unforeseen occurrences. . . . A party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes." (Citation omitted.) Id., 717, citing 2 Restatement (Second), Contracts § 261, p. 313 (1981), and E. Farnsworth, Contracts (1982) § 9.6, p. 678.

As we observed in *Dills*, "only in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens make performance less practical than initially contemplated. See, e.g., *Neal-Cooper Grain Co.* v. *Texas Gulf Sulphur Co.*, 508 F.2d 283, 294 (7th Cir. 1974) (party [is] not allowed 'to escape a bad bargain merely because it is burdensome'); *American Trading & Production* [*Corp.*] v. *Shell International Marine, Ltd.*, 453 F.2d 939, 942 (2d Cir. 1972) (closing of Suez Canal requiring charterer to sail nearly twice as many miles at . . . cost of nearly one-third more than . . . contract price does not excuse performance); *United States* v. *Wegematic* [*Corp.*], 360 F.2d 674, 676–77 (2d Cir. 1966) (duty of manufacturer to produce revolutionary computer system [was] not excused because of 'engineering difficulties' requiring two years and $1.5 million to correct); *Peerless Casualty Co.* v. *Weymouth Gardens*, 215 F.2d 362, 364 (1st Cir. 1954) (increased costs caused by . . . unexpected outbreak of war [do] not [end] obligation of contract); [*In re*] *Westinghouse Electric* [*Corp.*], 517 F. [Supp.] 440, 452–53 (E.D. Va. 1981) (duty to remove spent fuel [was]

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

not excused merely because reprocessing of . . . fuel became unprofitable) . . . .'' *Dills* v. *Enfield*, supra, 210 Conn. 717–18.

"Furthermore, the event [on] which the obligor relies to excuse his performance cannot be an event that the parties foresaw at the time of the contract." Id., 718. "Thus, the central inquiry is whether the nonoccurrence of the alleged impracticable condition was a basic assumption on which the contract was made." (Internal quotation marks omitted.) Id., 719, citing 2 Restatement (Second), supra, §§ 261 and 271, pp. 313, 354. "If an event is foreseeable, a party who makes an unqualified promise to perform necessarily assumes an obligation to perform, even if the occurrence of the event makes performance impracticable." (Internal quotation marks omitted.) *Dills* v. *Enfield*, supra, 210 Conn. 720.

Our description of *Dills* is apt for this case, as well, with respect to impossibility or impracticability. "This case, like virtually every case involving discharge from an obligation to perform, concerns the issue of which party bears the loss resulting from an event that renders performance by one party uneconomical. . . . Determining whether the [nonoccurrence] of a particular event was . . . a basic assumption involves a judgment as to which party assumed the risk of its occurrence . . . . In making such determinations, a court will look at all circumstances, including the terms of the contract. . . . [Because] impossibility and related doctrines are devices for shifting risk in accordance with the parties' presumed intentions, which are to minimize the costs of contract performance, one of which is the disutility created by risk, they have no place when the contract explicitly assigns a particular risk to one party or the other."[19] (Cita-

[19] For a prominent historical example of the doctrine of impossibility, see the California Supreme Court's decision in *Lloyd* v. *Murphy*, 25 Cal. 2d 48, 56, 153 P.2d 47 (1944), which held that restrictions on the production of new vehicles during World War II as a result of mobilizing industry to support national defense did not trigger the doctrine of impossibility so as to relieve

tions omitted; internal quotation marks omitted.) Id.; see *O'Hara* v. *State*, 218 Conn. 628, 636–38, 590 A.2d 948 (1991) (impossibility doctrine did not excuse duty to convey real property, despite nonoccurrence of roadway relocation project that was condition to conveyance, because contract anticipated that situation by requiring partial conveyance if condition did not occur); *Dills* v. *Enfield*, supra, 210 Conn. 709–11, 719–20 (impossibility doctrine did not excuse real estate developer from his obligation to submit acceptable construction plans to town's economic development agency for construction of industrial park, which would have allowed him to recover $100,000 deposit that developer had made to town pending financing, even though it would cost $250,000 to produce plans and developer had been unable to obtain project financing, because situation reflected bargained for provision in contract and was not unforeseeable given developer's previous financial difficulties); *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 307–308, 313–15, 514 A.2d 734 (1986) (impossibility doctrine did not relieve city of contractual obligations to real estate developer when popular referendum to turn certain land into park, which result had force of ordinance, resulted in cancellation of economic development project); *Hess* v. *Dumouchel Paper Co.*, 154 Conn. 343, 351–52, 225 A.2d 797 (1966) (planned condemnation of land for highway construction did not excuse tenant's performance of lease for warehouse until "the time of the actual taking" because "the imminence of condemnation did not operate to cancel the written lease" under impossibility doctrine).

Applying these principles, we conclude that the doctrine of impossibility or impracticability did not excuse

the tenant, an automobile dealer, of its obligations, even though the automobile sales business was rendered "less profitable and more difficult to continue" during that time.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

the defendants from their obligations to the plaintiff under the lease agreement. First, and most significant, as the trial court found, even under the most restrictive executive orders, use of the premises for restaurant purposes was not rendered factually impossible insofar as restaurants were permitted to provide curbside or takeout service, and the lease agreement did not prohibit curbside or takeout service. See, e.g., *Gap, Inc.* v. *Ponte Gadea New York, LLC*, supra, 524 F. Supp. 3d 237–38 (even though retailer's "performance may be burdensome, even to the extent of insolvency or bankruptcy," governmental prohibitions on physical retail business did not render performance of retail store lease impossible as matter of law given availability of curbside pickup of merchandise and force majeure clause of "limited application"); *In re Cinemex USA Real Estate Holdings, Inc.*, supra, 627 B.R. 700–701 (doctrine of impracticability did not excuse movie theater's rental obligation after reopening was allowed at 50 percent capacity, despite reduced revenues resulting from lack of new movie releases and reduced customer demand, and increased costs resulting from providing appropriate safety equipment and social distancing); *558 Seventh Ave. Corp.* v. *Times Square Photo, Inc.*, 194 App. Div. 3d 561, 561–62, 149 N.Y.S.3d 55 (concluding that doctrines of impossibility and frustration of purpose did not excuse obligation of electronics store to pay rent because, although it "was shuttered for a period as a result of [pandemic related] executive orders," which resulted in "reduced revenues," it "eventually reopened for curbside service and . . . [the tenant was] able to gain access to the premises during the period of nonpayment"), appeal dismissed, 37 N.Y.3d 1040, 176 N.E.3d 301, 154 N.Y.S.3d 564 (2021). But cf. *Doherty* v. *Monroe Eckstein Brewing Co.*, 198 App. Div. 708, 710–12, 191 N.Y.S. 59 (1921) (constitutional prohibition of sale of liquor rendered void for illegality

lease that was for exclusive purpose of "saloon business," namely, place for sale of intoxicating beverages); *1877 Webster Ave.*, *Inc.* v. *Tremont Center, LLC*, 72 Misc. 3d 284, 292, 148 N.Y.S.3d 332 (2021) (fact that "the exclusive purpose of the lease was to operate a first-class nightclub" created "a legally cognizable theory" that government shutdown of nonessential businesses rendered it "objectively impossible" for tenant "to conduct business as originally contemplated by the parties' lease"). Although the COVID-19 restrictions had undoubtedly serious economic consequences for the viability of the bistro—in particular, the initial closure for indoor dining, followed by the loss of bar business and a reopening for indoor dining only with a drastic reduction in capacity—they did not, by themselves, make performance under the lease agreement impossible or commercially impracticable as a matter of law.[20] Instead, they simply raised the cost of performance for the defendants in a manner that rendered it perhaps highly burdensome, but not factually impossible—akin

---

[20] We disagree with the defendants' reliance on *Bush* v. *ProTravel International, Inc.*, supra, 192 Misc. 2d 743, because that case presented issues of physical impossibility that make the case distinguishable from the present case. In *Bush*, a New York trial court held that the impossibility doctrine excused a customer's compliance with a September 14, 2001 cancellation deadline in a travel company's contract for a safari vacation, given the state of emergency in New York City in the days following the September 11 terrorist attacks. See id., 753–54. Observing that, "on the days at the focal point of the argument . . . September 12, 13 and 14, 2001, New York City was in [a] state of virtual lockdown with travel either forbidden altogether or severely restricted"; id., 750; and that telephone communications were disabled into lower Manhattan where the travel company's office was located; id., 746; the court followed "wartime precedents [that] developed the law of temporary impossibility"; id., 752; in denying the travel company's motion for summary judgment on the ground that the traveler had established a genuine issue of material fact that compliance with the September 14 cancellation deadline for the return of her deposit was factually impossible. Id., 754. We disagree with the defendants' reliance on *Bush* because that case concerned physical impossibility created in the wake of the September 11 attacks in the neighborhood of the travel agent's office, as opposed to the commercial impracticability and lack of profitability at issue in the present case.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

to the outbreak of war, or the closure of the Suez Canal, which had been held not to discharge contractual duties under the doctrine of impossibility. See *Dills* v. *Enfield*, supra, 210 Conn. 717–18 (citing cases).

Second, the language of the lease agreement suggests that events of the magnitude of the COVID-19 pandemic were not entirely unforeseeable. The lease agreement lacks a force majeure clause that would govern the parties' mutual obligations in the event of a crisis situation beyond their control,[21] and, to the extent that the lease agreement provides for any forgiveness of obligation in a crisis situation (thus suggesting that they are foreseeable), it excuses only the *plaintiff's* obligations—under § 25 of the lease agreement governing "unavoidable delay" occasioned by a variety of circumstances, including fire or "governmental [preemption] in connection with a national emergency . . . ."[22]

---

[21] "[T]he basic purpose of force majeure clauses . . . is in general to relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." *Phillips Puerto Rico Core, Inc.* v. *Tradax Petroleum Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985); see *Harriscom Svenska, AB* v. *Harris Corp.*, 3 F.3d 576, 580 (2d Cir. 1993) ("[l]ike commercial impracticability, a force majeure clause in a contract excuses nonperformance when circumstances beyond the control of the parties prevent performance"). Although force majeure events "[h]istorically . . . connoted events that rendered a party's performance impossible because of an unforeseeable event beyond the parties' control," with "[s]uch events . . . often described as acts of God" or resulting from "natural disasters such as earthquakes and floods, [force majeure] has since come to encompass many man-made and [man caused] events such as strikes, market shifts, terrorist attack[s], computer hacking, and governmental acts, among many others. In other words, force majeure provides a flexible concept that permits the parties to formulate an agreement to address their unique course of dealings and industry idiosyncrasies, allowing contractual force majeure clauses to have a much wider application than the doctrine would under its historical roots." (Footnotes omitted; internal quotation marks omitted.) J. Robinson et al., "Use the Force? Understanding Force Majeure Clauses," 44 Am. J. Trial Advoc. 1, 2–3 (2020).

[22] Section 25 of the lease agreement provides: "[The plaintiff] shall not be in default hereunder if it is unable to fulfill or is delayed in fulfilling any of its obligations hereunder, including, without limitation, any obligations to

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

Finally, § 4 (d) of the lease agreement squarely tasks the defendants with the obligation of complying with all governmental "laws, orders and regulations . . . ." See footnote 13 of this opinion. Accordingly, we conclude that the trial court correctly determined that the defendants did not establish the special defense of impossibility by a preponderance of the evidence.

## B

## Frustration of Purpose

We now turn to the defendants' claim under the frustration of purpose doctrine. The defendants argue that the COVID-19 pandemic and required shutdown pursuant to the executive orders, which was an unforeseen event beyond the control of either party, frustrated the purpose of the lease agreement, as stated by § 1 (o), namely, "the operation of a first-class restaurant and bar selling food, beverages and related accessories, together with uses incidental thereto, and for no other purpose."[23] Relying on the prohibition era decision in

supply any service hereunder, or any obligation to make repairs or replacements hereunder, if it is prevented from fulfilling or is delayed in fulfilling such obligations by reason of fire or other casualty, strikes or labor troubles, governmental [preemption] in connection with a national emergency, shortage of supplies or materials, or by reason of any rule, order or regulation of any governmental authority, or by reason of the condition of supply and demand affected by war or other emergency, or any other cause beyond its reasonable control (collectively, 'Unavoidable Delay'). *Such inability or delay by* [*the plaintiff*] *in fulfilling any of its obligations hereunder shall not affect, impair or excuse* [*the defendants*] *from the performance of any of the terms, covenants, conditions, limitations, provisions or agreements hereunder on its part to be performed, nor result in any abatement of* [*r*]ent *payable hereunder*." (Emphasis added.)

[23] As they emphasized at oral argument before this court, the defendants also claim that the lease has the specific purpose of allowing the operation of a " 'first-class restaurant,' " which they describe as a "high-end," indoor, fine dining business with a "premium rent to obtain [the] benefit of exposure to large numbers of consumers in a highly trafficked retail and commercial location." They contend that the lease agreement's language is ambiguous with respect to whether the *use of the premises was specifically and contractually limited to that kind of restaurant*, which would support their argument that the "purpose of the lease [was never] to operate anything

343 Conn. 309 MAY, 2022 333

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

*Doherty* v. *Monroe Eckstein Brewing Co.*, supra, 198 App. Div. 708, and a recent Massachusetts decision, *UMNV 205-207 Newbury, LLC* v. *Caffé Nero Americas, Inc.*, Docket No. 2084CV01493-BLS2, 2021 WL 956069 (Mass. Super. February 8, 2021), among other cases, the defendants contend that the purpose of the lease agreement was frustrated and "rendered valueless" given that the executive orders in effect until June 16, 2020, eliminated the indoor, "on premises dining with bar service" that had constituted their "business trade," despite the lack of limitations to that effect in the provisions of the lease agreement. In response, the plaintiff argues that the case law cited by the defendants is distinguishable and that the trial court correctly determined that the executive orders did not frustrate the purpose of the lease agreement because a legal use for the premises remained available to the defendants under its terms, namely, the service of food and beverages for off premises consumption. We agree with the plaintiff and conclude that the trial court correctly determined that the executive orders did not frustrate the purpose of the lease agreement.

other than a first-class restaurant, which precludes a majority takeout dining experience, and there was no prior established takeout business." The defendants further argue that the executive orders frustrated this specific, limited purpose. In response, the plaintiff contends that we should not review this claim regarding the effect of the "first-class restaurant" language because it was not raised before the trial court.

We agree with the plaintiff and conclude that this issue with respect to the inconsistency in the lease agreement is not preserved. Although the defendants' posttrial brief discussed the nature of its fine dining business, including entree prices and associated bar revenues, it did not claim that the language of the lease agreement limited the use of the premises to a particular kind of restaurant business. Indeed, counsel for the defendants acknowledged at oral argument before this court that this issue was not specifically litigated before the trial court, with no evidence introduced as to the drafting of the lease agreement. Accordingly, we decline to consider this claim further because it was not presented to the trial court and, therefore, is unpreserved for appellate review. See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 157–60, 84 A.3d 840 (2014); *Graham* v. *Commissioner of Transportation*, 206 Conn. App. 497, 505–506, 260 A.3d 1275 (2021).

"The doctrine of frustration of purpose . . . excuses a promisor in certain situations [in which] the objectives of the contract have been utterly defeated by circumstances arising after the formation of the agreement. . . . Excuse is allowed under this rule even though there is no impediment to actual performance. . . . A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that: (1) the event substantially frustrated his principal purpose; (2) the nonoccurrence of the supervening event was a basic assumption on which the contract was made; (3) the frustration resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes."[24] (Citation omitted; internal quotation marks omitted.) *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 315 Conn. 596, 605, 109 A.3d 473 (2015); see *Hess* v. *Dumouchel Paper Co.*, supra, 154 Conn. 350–51. "[T]he establishment of the defense requires convincing proof of a changed situation so severe that it is not fairly regarded as being within the risks assumed under the contract. . . . The doctrine

[24] Our Appellate Court has observed that the "doctrine of frustration of purpose was first recognized in the [turn of the century] English case of *Krell* v. *Henry*, 2 K.B. 740 (C.A. 1903). In that case, a spectator entered into a contract to rent an apartment for the purpose of viewing the procession for the coronation of King Edward VII. When the coronation was postponed and the procession cancelled, the spectator refused to pay for the rental, breaching the contract. . . . When the apartment owner sued, the court excused the breach, holding that the 'coronation procession was the foundation of this contract' . . . and that 'the object of the contract was frustrated by the non-happening of the coronation and its procession on the days proclaimed.' . . . The court implicitly determined that, had the parties contemplated the possibility of the coronation being cancelled, they would have included a provision allowing the spectator to terminate the contract under those circumstances. Thus, the doctrine of frustration of purpose, as it originated and has since been applied by Connecticut courts, acts to provide an excuse for nonperformance by a party whose purposes were thwarted by events the parties did not contemplate and could not foresee." (Citations omitted.) *DDS Wireless International, Inc.* v. *Nutmeg Leasing, Inc.*, 145 Conn. App. 520, 525–26, 75 A.3d 86 (2013).

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

of frustration of purpose is given a narrow construction so as to preserve the certainty of contracts . . . .'' (Citation omitted; internal quotation marks omitted.) *Godfrey* v. *Commissioner of Correction*, 202 Conn. App. 684, 693, 246 A.3d 1032, cert. denied, 336 Conn. 931, 248 A.3d 2 (2021), quoting 17A Am. Jur. 2d 618, Contracts § 640 (2016), and 17A Am. Jur. 2d, supra, § 641, p. 619; see *O'Hara* v. *State*, supra, 218 Conn. 638 (circumstances giving rise to frustration of purpose must be unforeseeable at time of contract); see also *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, supra, 605– 606 (doctrine did not apply when purpose of lease was to lease property, and tenant continued to occupy property, despite lack of environmental remediation in connection with option to purchase); *O'Hara* v. *State*, supra, 638–39 (doctrine did not apply with respect to purchase of land because ''the agreement explicitly acknowledged the possibility that the plans for relocation could be altered,'' meaning that ''the parties foresaw that the state might acquire a greater portion of the eastern property than originally proposed''); *Hess* v. *Dumouchel Paper Co.*, supra, 351 (The purpose of the lease agreement was not frustrated by ''the impending condemnation'' of the leased warehouse for the construction of a highway because the ''purpose of the agreement, from the defendant's point of view, was to provide storage space for its inventory,'' which ''survived the announcement of the highway construction plans, as evidenced by the defendant's purchase of its own warehouse. At the time of the actual taking, of course, the objective of the contract would have become frustrated, and performance by the plaintiff rendered impossible . . . .''); *DDS Wireless International, Inc.*, v. *Nutmeg Leasing, Inc.*, 145 Conn. App. 520, 527, 75 A.3d 86 (2013) (doctrine did not excuse taxi company from its obligations under service contract for mobile dispatch system because termination clause in contract indicated that ''the parties plainly did con-

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

template a situation in which the [taxi company] would not be satisfied with the dispatch system or the service provided'').

Given the narrowness of the frustration of purpose doctrine, we conclude that the purpose of the lease agreement was not frustrated by the pandemic restrictions imposed by the executive orders, even those that barred indoor dining entirely. The language of the lease agreement was not limited to a certain type of dining and—in contrast to the more restrictive language contained in the sister state cases on which the defendants rely—did not preclude the takeout and subsequent outdoor dining that the defendants sought to provide. Put differently, the lease terms did not by themselves render the lease agreement valueless in light of the executive orders. See *Gap, Inc.* v. *Ponte Gadea New York, LLC*, supra, 524 F. Supp. 3d 235 (pandemic restrictions did not frustrate purpose of retail store lease, despite adverse economic consequences and dramatic reduction of foot traffic in area of store, given availability of curbside pickup and reopening for shopping with restrictions, because lease did not make ''any guarantee regarding foot traffic or the nature or demographic characteristics of the area of the . . . store premises''); *In re Cinemex USA Real Estate Holdings, Inc.*, supra, 627 B.R. 699–700 (doctrine of frustration of purpose did not excuse movie theater's rental obligation after reopening was allowed at 50 percent capacity, despite reduced revenues and increased operation costs).

The lack of use restrictions in the lease agreement at issue in this appeal, in juxtaposition with executive orders that did not completely shut down the restaurant industry, renders distinguishable the Massachusetts decision, *UMNV 205-207 Newbury, LLC* v. *Caffé Nero Americas, Inc.*, supra, 2021 WL 956069, on which the defendants rely. In that case, a state trial court concluded that the purpose of a restaurant lease had been

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

frustrated for the period of time between closure in March, 2020, and partial reopening in June, 2020, for outdoor dining and takeout, and subsequently limited indoor dining, given that the "main object or purpose of [the] contract" was limited by its specific language allowing the tenant to "use the *leased premises . . . to operate* [*only*] *a café with a sit-down restaurant menu 'and for no other purpose.*' "[25] (Emphasis added.) Id., *5; see id. ("[Because] the [l]ease limited the permissible use of the leased space to a single purpose, it cannot be disputed that [the defendant's] continued ability to operate a café [on] the leased premises, and the absence of government orders barring all restaurants from serving customers inside, was a basic assumption underlying the [l]ease. And there is no evidence that the risk of a global viral pandemic coming to Massachusetts and leading to a government order shutting down the entire restaurant industry was something the parties contemplated when they entered into the [l]ease."); cf. *Doherty* v. *Monroe Eckstein Brewing Co.*, supra, 198 App. Div. 711 (distinguishing lease making "[a] saloon business . . . the only business for which the tenant was authorized to use the premises" from other leases referring to "the character of the saloon business if conducted"). Accordingly, we conclude that the trial court correctly determined that the

---

[25] We note that the Massachusetts court further concluded that the lease's force majeure clause did not bar the application of the doctrine of frustration of purpose because that clause excepted financial inability to pay from causes deemed to be beyond a party's control, and "addresse[d] the risk that performance may become impossible, but [did] *not* address the distinct risk that the performance could still be possible even while the main purpose of the [l]ease is frustrated by events not in the parties' control." (Emphasis in original.) *UMNV 205-207 Newbury, LLC* v. *Caffé Nero Americas, Inc.*, supra, 2021 WL 956069, *6; see id., *7 (observing that separate provisions of lease address "a classic cause of frustration of purpose," namely, destruction or damage of leased premises, by limiting rent abatement/termination rights only to extent that landlord was made whole by insurance, and gave landlord 120 days to repair premises).

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

defendants did not prove the special defense of frustration of purpose.[26]

[26] Finally, we note that our conclusions in this appeal are consistent with the decisions of numerous federal and state courts that have held that the severe economic difficulties in the operation of restaurants, retail businesses, and other public accommodations that resulted from governmental actions intended to stem the spread of the COVID-19 pandemic have not excused them from the performance of their commercial lease agreements on grounds of impossibility, impracticability, or frustration of purpose. See *Gap, Inc.* v. *Ponte Gadea New York, LLC*, supra, 524 F. Supp. 3d 234–35, 237–38 (retail store); *In re NTS W. USA Corp.*, Docket No. 20-CV-6692 (CS), 2021 WL 4120676, *1, *5–7 (S.D.N.Y. September 9, 2021) (retail store); *In re Cinemex USA Real Estate Holdings, Inc.*, supra, 627 B.R. 695, 700–701 (movie theater); *STORE SPE LA Fitness* v. *Fitness International, LLC*, Docket No. SACV 20-953 JVS (ADSx), 2021 WL 3285036, *9–10 (C.D. Cal. June 30, 2021) (fitness center); *Gap, Inc.* v. *170 Broadway Retail Owner, LLC*, 195 App. Div. 3d 575, 576–78, 151 N.Y.S.3d 37 (2021) (retail store); *558 Seventh Ave. Corp.* v. *Times Square Photo, Inc.*, supra, 194 App. Div. 3d 561–62 (retail electronics store); *A/R Retail, LLC* v. *Hugo Boss Retail, Inc.*, 72 Misc. 3d 627, 648–50, 149 N.Y.S.3d 808 (2021) (retail store); *Greater New York Automobile Dealers Assn., Inc.* v. *City Spec, LLC*, Docket No. LT-053560-20/QU, 2020 WL 8173082, *7–10 (N.Y. Civ. December 29, 2020) (decision without published opinion, 70 Misc. 3d 1209, 136 N.Y.S.3d 695) (commercial office space); see also *CAI Rail, Inc.* v. *Badger Mining Corp.*, Docket No. 20 Civ. 4644 (JPC), 2021 WL 705880, *7–10 (S.D.N.Y. February 22, 2021) (decline in petroleum industry resulting from suppression of demand because of COVID-19 restrictions did not relieve lessee of railroad cars from obligation under lease, which lacked force majeure clause, pursuant to doctrines of impossibility or frustration of purpose under New York law); cf. *1600 Walnut Corp.* v. *Cole Haan Co. Store*, 530 F. Supp. 3d 555, 558–59 (E.D. Pa. 2021) (governor's shutdown orders were force majeure event that, under terms of lease, did not excuse retail tenant from obligation to pay rent, thus rendering doctrines of impossibility and frustration of purpose unavailable to relieve tenant of requirement to adhere to terms of lease).

To the extent that our independent research has found authority that excused—at least in part—tenants from their rental obligations during COVID-19, that authority rests on distinguishable lease language, namely, force majeure clauses that governed this particular situation. See *In re Cinemex USA Real Estate Holdings, Inc.*, supra, 627 B.R 699 (force majeure clause excusing performance for duration of certain events, including governmental action, excused movie theater from rent obligation during period of total shutdown due to COVID-19); *In re Hitz Restaurant Group*, 616 B.R. 374, 377–80 (Bankr. N.D. Ill. 2020) (concluding that force majeure clause excusing both parties from lease obligations that are " 'prevented or delayed, retarded or hindered by . . . laws, governmental action or . . . orders of government" proportionately reduced, but did not eliminate, restaurant tenant's rent obligations during COVID-19 shutdowns given that curbside and takeout service remained available); *1877 Webster Ave., Inc.* v. *Tremont*

343 Conn. 309 MAY, 2022 339

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

## II

## DAMAGES

We now turn to the plaintiff's cross appeal, in which it claims that the trial court improperly failed to award it the full difference in value between the defendants' lease agreement and the new lease that the plaintiff entered into with Sono Boil, the replacement tenant. The plaintiff argues that the trial court's award of damages, which held the defendants responsible only for rent accrued until December, 2020, and was $246,778.50 less than it sought, was inconsistent with the general standard for damages for breach of a lease contract, under which the breaching tenant is responsible for the payment of the full amount of the contract less the amounts that the landlord was able to mitigate with the new lease, thus placing the landlord in the position that it would be had the lease been performed. See, e.g., *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, 182 Conn. 444, 446, 438 A.2d 708 (1980); *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, 18 Conn. App. 384, 388–90, 558 A.2d 265 (1989). To this end, the plaintiff argues, inter alia, that the trial court improperly charged it with the burden of presenting evidence relating to its negotiations with Sono Boil to show an inability to mitigate its damages by obtaining the same lease or better terms than it had with the defendants, because the defendants, as the breaching party, bear the burden of proof as to failure of mitigation under cases such as *Vanliner Ins. Co.* v. *Fay*, 98 Conn. App. 125, 145, 907 A.2d 1220 (2006).

In response, the defendants contend that the trial court did not abuse its discretion in determining the

*Center, LLC*, supra, 72 Misc. 3d 292 (fact that "the exclusive purpose of the lease was to operate a first-class nightclub" presented "legally cognizable theory" of impossibility that government shutdown of nonessential businesses rendered it "objectively impossible" for tenant "to conduct business as originally contemplated by the parties' lease").

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

damages awarded. Relying on *Southhaven Associates, LLC* v. *McMerlin, LLC*, 159 Conn. App. 1, 122 A.3d 670 (2015), and *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, supra, 18 Conn. App. 384, among other cases, the defendants argue that the trial court retained the discretion not to award the full value of the lease agreement as a basis for damages, given the plaintiff's failure to introduce evidence as to negotiations with prospective tenants, changes in economic conditions or fair market value of the premises. Finally, the defendants contend that the plaintiff failed to move for an articulation that would have indicated that the trial court applied an erroneous legal standard in awarding damages. We agree with the plaintiff and conclude that a new damages hearing is required because the trial court improperly assigned it the burden of proving the mitigation of damages.[27]

Certain well established principles, discussed in this court's decision in *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, supra, 182 Conn. 446–47, govern the plaintiff's claims in its cross appeal. "[W]hen the lessee breaches a lease for commercial property, the lessor has two options: (1) to terminate the tenancy; or (2) to refuse to accept the surrender. . . . [When] the landlord elects to continue the tenancy, he may sue

---

[27] As a corollary to its burden of proof claim, the plaintiff contends that the trial court's damages award is clearly erroneous insofar as the trial court concluded that the plaintiff failed to prove its entitlement to damages via the presentation of evidence relating to those negotiations with Sono Boil. The plaintiff, however, asks us to remand the case to the trial court with direction to award it $447,087.26, which reflects the full remaining value of the payments due under the lease agreement. On the other side of that coin, the defendants argue in their appeal that the trial court improperly failed to consider relevant facts regarding the breakdown in negotiations between the parties in determining whether the plaintiff had mitigated its damages. Because a remand for a new hearing is required given that the trial court applied the improper legal standard in calculating the damages, we need not reach these claims with respect to the calculation of damages as a factual matter.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

to recover the rent due under the terms of the lease. Under this course of action, the landlord is under no duty to mitigate damages. . . . When the landlord elects to terminate the tenancy, however, the action is one for breach of contract . . . and, when the tenancy is terminated, the landlord is obliged to mitigate his damages. . . . The general rule for the measure of damages in contract is that the award should place the injured party in the same position as he would have been in had the contract been performed." (Internal quotation marks omitted.) *Southhaven Associates*, *LLC* v. *McMerlin*, *LLC*, supra, 159 Conn. App. 10–11; see, e.g., *Brennan Associates* v. *OBGYN Specialty Group*, *P.C.*, 127 Conn. App. 746, 754–55, 15 A.3d 1094, cert. denied, 301 Conn. 917, 21 A.3d 463 (2011). If a landlord "institute[s] an action for breach of lease . . . the remaining rental payments due under the lease *could* be used as part of the calculation of the damages that the [landlord] sustained." (Emphasis added.) *Southhaven Associates*, *LLC* v. *McMerlin*, *LLC*, supra, 11; see, e.g., *Brennan Associates* v. *OBGYN Specialty Group*, *P.C.*, supra, 755; *Rokalor*, *Inc.* v. *Connecticut Eating Enterprises*, *Inc.*, supra, 18 Conn. App. 389–90. "The duty to mitigate damages [does] not require the plaintiff [landlord] to sacrifice any substantial right of its own . . . or to exalt the interests of the tenant above its own. . . . It [is] required to make reasonable efforts to minimize damages. What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier." (Internal quotation marks omitted.) *Southhaven Associates*, *LLC* v. *McMerlin*, *LLC*, supra, 5–6; see, e.g., *Brennan Associates* v. *OBGYN Specialty Group*, *P.C.*, supra, 754–55.

Ordinarily, we review the trial court's assessment of damages, including the reasonableness of any mitigation efforts, as a question of fact under the clearly erroneous standard of review. See, e.g., *Pan Handle Realty*,

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

*LLC* v. *Olins*, 140 Conn. App. 556, 569–70, 59 A.3d 842 (2013); *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, supra, 18 Conn. App. 390. A claim that the trial court applied an improper legal standard or burden of proof in its damages determination, however, presents a question of law over which we exercise plenary review. See, e.g., *In re Zakai F.*, 336 Conn. 272, 289–90, 255 A.3d 767 (2020); *Smith* v. *Muellner*, 283 Conn. 510, 536, 932 A.2d 382 (2007); *Papallo* v. *Lefebvre*, 172 Conn. App. 746, 755, 161 A.3d 603 (2017).

We begin with the plaintiff's claim that the trial court improperly required it, as the nonbreaching party, to bear the burden of proving that it had mitigated its damages.[28] There is no case directly on point from this court in the landlord-tenant context,[29] with the leading

[28] The defendants correctly state that, when a trial court's memorandum of decision is ambiguous as to the burden of proof applied, it is the responsibility of the appellant—in this case, the plaintiff—to move pursuant to Practice Book § 61-10 for an articulation on that point. See, e.g., *Smith* v. *Muellner*, supra, 283 Conn. 537. In the present case, we conclude that the trial court's memorandum of decision is unambiguous insofar as it can be read only to assign the burden of proving the reasonableness of mitigation to the plaintiff, by expressly questioning its failure to introduce evidence of its negotiations with Sono Boil in stopping the accrual of damages in December, 2020. Accordingly, we disagree with the defendants' argument that the record is not adequate for review of this issue.

[29] Our sister states are split with respect to which party bears the burden of proving mitigation of the lessor's damages in the wake of a breach of a commercial lease in view of the " 'modern trend' " of treating real property leases as contractual in nature, rather than as assignments of property rights. *Frenchtown Square Partnership* v. *Lemstone, Inc.*, 99 Ohio St. 3d 254, 257, 791 N.E.2d 417 (2003); see, e.g., *Reid* v. *Mutual of Omaha Ins. Co.*, 776 P.2d 896, 905 (Utah 1989) (describing "the traditional rule" not requiring mitigation as "anachronistic"). Some follow traditional contract and tort law principles in holding that it is the breaching party's obligation to prove a violation of the duty to mitigate damages, such as by affirmative defense. See, e.g., *Frenchtown Square Partnership* v. *Lemstone, Inc.*, supra, 259; *Austin Hill Country Realty, Inc.* v. *Palisades Plaza, Inc.*, 948 S.W.2d 293, 299–300 (Tex. 1997). Others allocate to the landlord the burden of proving that it satisfied its "affirmative obligation" of mitigating damages for breach of a lease by making "commercially reasonable" efforts to obtain a new tenant because that requirement ensures that "serious efforts are made to redeploy the rental property in a productive fashion by those who are best

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

decision, *Danpar Associates*, being silent with respect
to the allocation of the burden of proof as to mitigation.
Consistent, however, with the black letter principles of
damages law that led this court in *Danpar Associates*
to require landlords to mitigate their damages in the
wake of a breach of a lease,[30] our Appellate Court held
in *Pan Handle Realty, LLC* v. *Olins*, supra, 140 Conn.
App. 569–70, that the tenant, as the party breaching a
residential lease, is required to prove that the landlord
failed to make efforts to mitigate its damages. For that
position, the Appellate Court cited to its decision in
*Dunleavey* v. *Paris Ceramics USA, Inc.*, 97 Conn. App.
579, 582–83, 905 A.2d 703 (2006), which is a contract
case involving the sale of defective limestone for a
landscape project. See *Pan Handle Realty, LLC* v.
*Olins*, supra, 569–70; see also id., 570–71 (trial court's
conclusion that landlord made reasonable efforts to
mitigate damages was not clearly erroneous because
landlord had to spend $80,000 to restage property with
furnishings and advertise property at higher rent than

---

able to accomplish that end and who are also best able to prove that required
mitigation efforts have been carried out." *Reid* v. *Mutual of Omaha Ins.
Co.*, supra, 906–907; see also annot., C. Vaeth, Landlord's Duty, on Tenant's
Failure To Occupy, or Abandonment of, Premises, To Mitigate Damages by
Accepting or Procuring Another Tenant, 75 A.L.R.5th 1, 129–48, § 14 (2000
and Supp. 2020) (discussing split of authority).

[30] In *Danpar Associates*, this court cited a commercial contract case,
*Willametz* v. *Goldfeld*, 171 Conn. 622, 627, 370 A.2d 1089 (1976), an eminent
domain condemnation damages case, *Connecticut Light & Power Co.* v.
*Costello*, 161 Conn. 430, 442, 288 A.2d 415 (1971), and a motor vehicle
negligence case, *Brown* v. *Middle Atlantic Transportation Co.*, 131 Conn.
197, 199, 38 A.2d 677 (1944), for the proposition that a landlord who brings
an action for damages from the breach of a lease "is entitled to recover
those damages [that] would naturally flow from a total breach of the lease"
but was obligated to make "reasonable efforts" to "minimize the damages
occasioned by the defaulting tenant's breach of contract." *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, supra, 182 Conn. 446; see id.,
446–47 (trial court properly considered landlord's refusal to accept assignment of lease to new tenant that "would have placed it in statu[s] quo
ante" in determining whether landlord made reasonable efforts to minimize
damages from breach of lease of premises in shopping center).

tenant had been willing to pay to recoup losses, and, "although the [landlord] was unsuccessful in its efforts to secure a replacement lessee, there is no evidence to suggest that the [landlord] was not responsive to prospective replacement lessees").

The allocation of the burden of proving the failure to mitigate to the breaching tenant in *Pan Handle Realty, LLC*, is consistent with a long line of case law, in both contract and torts contexts, that holds that the failure to mitigate damages is for the breaching party to prove. See *Preston* v. *Keith*, 217 Conn. 12, 21–22, 584 A.2d 439 (1991) (defendant bears burden of production and persuasion with respect to mitigation of damages in negligence case); *Newington* v. *General Sanitation Service Co.*, 196 Conn. 81, 86, 491 A.2d 363 (1985) (sanitation company bore burden of proving that "the [defendant] town failed to use reasonable care to reduce its damages" for company's breach of refuse disposal contract); *Krawitz* v. *Ganzke*, 114 Conn. 662, 665, 159 A. 897 (1932) (The court held that an employee who was discharged in violation of an employment contract "was prima facie entitled to recover the amount of his salary for the balance of the year, and was not bound to offer evidence that he had sought other employment. The burden was [on] the defendant to prove that the plaintiff could by proper diligence have found other employment, if such was claimed to be the fact."); see also *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, 237 Conn. 209, 228–29, 676 A.2d 844 (1996) (relying on "established rules" as to proof of damages in contract and tort cases, and holding that, with respect to award for damages for discriminatory employment practices pursuant to General Statutes § 46a-86 (c) and (d), employer bears burden of proving that employee "failed to make reasonable efforts to mitigate the amount of damages by seeking other employment").

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

As we have observed in the tort context, the "ratio-
nale for this rule is well established. A defendant claim-
ing that the plaintiff has failed to mitigate damages
seeks to be benefited by a particular matter of fact, and
he should, therefore, prove the matter alleged by him.
The rule requires him to prove an affirmative fact,
whereas the opposite rule would call [on] the plaintiff
to prove a negative, and therefore the proof should
come from the defendant. He is the wrongdoer, and
presumptions between him and the person wronged
should be made in favor of the latter. For this reason,
therefore, the onus must in all such cases be [on] the
defendant." (Internal quotation marks omitted.) *Pres-
ton* v. *Keith*, supra, 217 Conn. 22. We note that this
process need not be onerous because, in addition to
presenting witnesses or documentary evidence to estab-
lish the point, the defendant could well establish failure
of mitigation through cross-examination of the plaintiff
and its witnesses. See id., 22–23. Accordingly, we con-
clude that, when a tenant has breached a lease agree-
ment, that tenant bears the burden of proving that the
landlord failed to undertake commercially reasonable
efforts to mitigate its damages.[31]

Thus, we conclude that the trial court improperly
cast the burden of proof onto the plaintiff when, in

[31] Although not squarely addressing the issue of the burden of proof, we
note that the Appellate Court's decision in *Rokalor, Inc.* v. *Connecticut
Eating Enterprises, Inc.*, supra, 18 Conn. App. 384, may be read to suggest
that it is the landlord who bears the burden of proving reasonable efforts,
insofar as it refers to failures of proof on the part of the landlord in that
case. See id., 390–91 (observing that landlord "did not hire a real estate
broker until almost four months after the defendant's default . . . provided
no explanation for this delay" and "did not introduce any evidence by the
broker to establish what efforts were made by him to lease the premises"
in concluding that trial court did not abuse discretion in "finding that the
[landlord] failed to make reasonable efforts to mitigate its damages"). To
the extent that the Appellate Court's decision in *Rokalor, Inc.*, may be read
to require the nonbreaching landlord to bear the burden of proving that it
did not fail to mitigate its damages, we conclude that it is not an accurate
statement of the law.

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

stopping accrual of monthly rent damages in December, 2020, the trial court credited evidence that the plaintiff had made efforts to mitigate its damages by securing Sono Boil as its new tenant for the premises but stated that "no evidence of the negotiations with [Sono Boil] was presented in detail *by the plaintiff*. The court can only speculate if further negotiations with [Sono Boil] could have resulted in a lease with the same terms the defendants' lease had." (Emphasis added.) By engaging in this speculation in connection with reducing the contract damages that it ultimately awarded to the plaintiff, the trial court effectively relieved the defendants of their burden of proving that the plaintiff's efforts were, in fact, commercially unreasonable under the circumstances. Accordingly, a new damages hearing is required. See, e.g., *South Windsor* v. *Lanata*, 341 Conn. 31, 46–47, 266 A.3d 875 (2021).

Consistent with other courts; see, e.g., *In re Cinemex USA Real Estate Holdings, Inc.*, supra, 627 B.R. 701; we observe in conclusion that the COVID-19 public health emergency has had devastating economic effects in many industries, particularly those that rely on the public, such as the restaurant and hospitality industry. This case, which is a contract dispute between private parties, demonstrates the difficulty of using existing legal doctrines to shield parties from the economic damage caused by the pandemic, insofar as the zero sum nature of litigation renders it a process that is particularly ill-suited to resolving these difficult questions of public and economic policy in an equitable manner that will leave something remaining on the "other side" as we attempt to identify a "new normal" while entering the third year of this pandemic. We therefore are left to rely on the political branches of our federal and state governments to identify and implement economic relief in an equitable manner, so as to will enable all of our state's businesses and citizens to thrive in the wake of COVID-19.

343 Conn. 309 MAY, 2022 347

AGW Sono Partners, LLC *v.* Downtown Soho, LLC

The judgment is reversed only with respect to the award of damages and the case is remanded for further proceedings as to damages; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.